The **GREENERY REHABILITATION GROUP, INC., Plaintiff,**

v.

**Marva L. HAMMON, as Commissioner of the New York City Human Resources Administration, the City of New York, and Michael Dowling, as Commissioner of the New York State Department of Social Services, Defendants.**

**Marva L. HAMMON, as Commissioner of the New York City Human Resources Administration, the City of New York, and Michael Dowling, as Commissioner of the New York State Department of Social Services, Third–Party Plaintiffs,**

v.

**Donna E. SHALALA, as Secretary of the United States Department of Health and Human Services, Third–Party Defendant.**

No. 93–CV–309.

United States District Court, N.D. New York.

July 25, 1995.

exercise of RIHMFC's contractual rights as a mortgagee.

Bond, Schoeneck & King, Albany, NY (Hermes Fernandez, of counsel), for plaintiffs.

New York City Corp. Counsel, New York City, NY (Norma Cote, of counsel), for Marva Hammon and City of New York.

Dennis C. Vacco, Atty. Gen., State of N.Y., Dept. of Law, Albany, NY (Deirdre Roney, Asst. Atty. Gen., of counsel), for Michael Dowling.

Thomas J. Maroney, U.S. Atty., N.D.N.Y., Albany, NY (James C. Woods, Asst. U.S. Atty., of counsel), for Donna E. Shalala.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

### I. FACTUAL BACKGROUND

The Greenery Rehabilitation Group, Inc. ("the Greenery") specializes in the field of traumatic brain injury treatment and operates facilities in several states. The Greenery entered into an agreement with the New York City Human Resources Administration (HRA) which provided that the Greenery, with the approval of the New York State Department of Social Services (DSS), would admit into its specialized brain injury programs New York City residents who are in need of such services and who are eligible for Medicaid.

The Greenery admitted three New York City residents into its specialized brain injury programs who met the financial eligibility criteria, but for whom HRA has refused to pay. These three patients, Izeta Ugljanin, Yik Kan, and Leon Casimir, are aliens residing in the United States. Izeta Ugljanin, an immigrant from what is now the Republic of Macedonia residing in New York City, was thrown from a car in which she was riding and suffered severe injuries, including brain damage. Yik Kan, then a forty-six-year-old immigrant from Hong Kong legally residing in New York City, was beaten in Manhattan's Central Park in 1990 which resulted in severe injuries, including brain damage.

And lastly, Leon Casimir, then a thirty-eight-year-old immigrant from Trinidad residing in New York City, was shot in the head in 1991. He also suffered serious brain damage. All three patients were initially taken to local hospitals in New York but were later transferred to Greenery facilities.[1] The Greenery alleges that all three patients had Medicaid numbers at the time of their admission.

Because of the high level of specialized care provided by the Greenery, the three named aliens could not be admitted without the prior approval of the New York State Department of Health (DOH). At trial, the issue of whether DOH did, in fact, approve the admission of these three aliens into the Greenery's specialized brain injury programs was litigated. Regardless, the Greenery has provided care to the three aliens, the cost of which, at the rates approved by the State of New York, amounted to $152,612.28, $213,916.10 and $181,604.76 respectively through November 30, 1992. The Greenery continues to provide such care today. Plaintiff Greenery now seeks a declaration which states that the care and services provided to the three aliens have been for the treatment of emergency medical conditions, thus entitling it to Medicaid reimbursement for the care provided.

## II. STATUTORY BACKGROUND

Title XIX of the Social Security Act ("the Act") establishes a jointly funded, cooperative federal-state program known as Medicaid designed to enable each state to furnish medical assistance to eligible individuals. *See Atkins v. Rivera,* 477 U.S. 154, 156–57, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131 (1986). The program, enacted in 1965, was established "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Schweiker v. Hogan,* 457 U.S. 569, 571, 102 S.Ct. 2597, 2600, 73 L.Ed.2d 227 (1982), *quoting, Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). If a state chooses to participate in the program, it must

do so in accordance with the broad framework set by the federal government through the Act. If the state satisfies these requirements, it has wide discretion in administering its program "including the responsibility for determining the eligibility of recipients, enlisting medical service providers, and paying those providers for services rendered." *De-Gregorio v. O'Bannon,* 500 F.Supp. 541, 545 (E.D.Pa.1980).

New York State regulations provide that, in general, aliens lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law who meet Medicaid requirements are eligible to receive the full range of Medicaid benefits. N.Y.COMP.CODES R. & REGS. tit. 18, § 360–3.2(f). However, aliens who meet Medicaid program requirements but who are not lawfully admitted for permanent residence, or otherwise permanently residing in the United States under color of law, or who have not been granted lawful permanent resident status under the Federal Immigration Reform and Control Act of 1986, are not eligible to receive medical assistance unless the care and services are necessary for the treatment of an "emergency medical condition." N.Y.COMP.CODES R. & REGS. tit. 18, § 360–3.2(f)(2). The New York statutory language is substantially the same as the language of the Act. *See* 42 U.S.C. § 1396b(v).

It is the interpretation of the term "emergency medical condition" which is at the heart of the present litigation. The Greenery contends that the patients in question are receiving treatment for emergency medical conditions within the statutory and regulatory definitions. The State and City defendants contend otherwise and look to HHS for the correct interpretation of the section in question. HHS has argued unsuccessfully that it should not be part of this litigation at all.

The third-party plaintiffs allege that HHS' refusal to provide guidance to DSS resulted in the instant litigation. Prior to commencing this litigation, the Greenery's attorney

---

1. The Greenery runs several skilled nursing facilities in Massachusetts, including centers in Brighton, Middleboro, and Hyannis.

contacted the State agency concerning the Greenery's claim that Medicaid should pay for the chronic care it was providing to the three patients in question. After receiving the inquiry, DSS referred the issue to HHS and requested that the federal agency evaluate the circumstances of the patients in question and give guidance concerning whether Medicaid should pay for their care. The third-party plaintiffs allege that HHS refused to give such guidance.

## III. PROCEDURAL BACKGROUND

The State and City defendants removed the instant case to this Court and filed a third party complaint against defendant Shalala as the Secretary of the United States Department of Health and Human Services (HHS). HHS is the federal agency that administers the Medicaid program. The third party complaint asks that, should the Court determine that the state Medicaid program must pay for the cost of these patients' care (the finding sought in the initial complaint), the Court then determine that HHS must also bear part of that cost pursuant to federal statutes which provide that Medicaid costs are to be divided among the federal, state, and city governments. *See* 42 U.S.C. §§ 1396a, 1396b. After numerous motions from the parties, the court conducted a bench trial on the remaining issues on April 13, 1995. Only two issues remained at trial:

1. Did the Greenery receive the prior consent required by New York State Medicaid for the three patients in question in regard to their admission to Greenery facilities?

2. Has the Greenery provided emergency medical care to these patients within the meaning of the statute and corresponding regulations?

The court decides these issues in the following discussion.

## IV. FINDINGS REGARDING PRIOR APPROVAL

The State and City defendants have asserted that the Greenery did not receive "prior authorization" before admitting Izeta Ugljanin, Yik Kan, and Leon Casimir to its facilities. These defendants have asserted that the proper consent, which must be obtained when admitting a Medicaid patient to a long term care facility includes two steps, one known as "prior approval," and the other known as "prior authorization."

Myrna Ryan, the Director of Case Management for the Greenery, Christine Reilly, who handles admissions for Horizon Health Care, and was the Director of Admissions for the Greenery in Brighton, Massachusetts from 1991 to 1994, and Karen Krichmar, Director of Marketing Support Services for Horizon Health Care (previously the Greenery) each testified as to the process used for admitting patients in general and in the three instances at issue.

Christine Reilly testified that as Director of Admissions at the Greenery in Brighton, she worked with referral sources to initiate the intake of patients and handled all necessary prior approvals. She worked with the New York City HRA from 1991 to 1994 on various admissions and received approval prior to admitting the patients. She discussed the system for prior approval of patients coming to the Greenery facilities from New York and how she followed this procedure for the three individuals in question. She noted that other patients from New York have been admitted to Greenery facilities and that the Greenery is receiving Medicaid payments for their care after following the same prior approval procedure. Reilly stated that no one from HRA, the Department of Social Services, or the Department of Health ever told her that documents were missing or that anything called "prior authorization" was lacking in these three cases, even though she testified that she spoke with a man named Dr. Shankman at the New York State Department of Health hundreds of times.[2] She testified that in all three cases, she followed the procedure outlined in a letter dated August 20, 1990 from the New York State Department of Social Services, which notably, detailed the process necessary for prior approval but did not discuss anything labelled "prior authorization" or mention that addi-

2. It was Dr. Shankman who signed the prior approvals for all three patients.

tional steps were necessary for admitting a patient.[3] Pltf. Exh. 34.

Myrna Ryan testified that she had previously handled Medicaid benefit conversions for individuals coming to the Greenery from New York City and she handled this process in the cases of the three patients at issue. She explained that the "Medicaid hospital number" assigned to each patient when he or she initially enters a hospital for medical treatment must be converted to a "long term care number" when the patient is transferred to a long term care facility such as the Greenery. She noted that the actual Medicaid number remains the same but that the facility must get approval for long term care from the New York City HRA. She also stated that this conversion cannot take place until after the patient has entered the long term care facility. She attempted to conduct this process for the three individuals at issue and she noted that she is unaware of any financial changes these patients have undergone since entering the Greenery.[4] Each of these patients had a Medicaid number when they entered the Greenery. The "conversion packets," the paperwork required for changing a "Medicaid hospital number" to a "long term care number," for all three individuals were entered into evidence. Ryan testified that she knew that all New York rules must be followed or Medicaid benefits could be denied. Although testimony and exhibits showed that there were difficulties in getting Medicaid coverage for the three patients at issue, Ryan testified that she was never told by the HRA that the Greenery was not being paid because it failed to obtain "prior authorization." In fact, she noted that the issue of "prior authorization" was never raised by the HRA during their discussions of the three cases.

The relevant testimony of these witnesses was essentially reiterated by Karen Krichmar, Director of Marketing Support Services for Horizon Health Care which was previously the Greenery. She also noted that 60 to 70 percent of the approximately 600 New York residents treated by the Greenery were New York City residents, that she did not know of a "prior authorization" process, and that the same approval process was followed in the three cases at issues as in the case of every other New York resident patient.

Defendants submitted a series of letters, all from 1984 through 1986, which show that during this period, the Greenery received placement approval for patients from the New York City HRA prior to their admission.[5] Plaintiffs submitted documentation which shows that "prior approval" was received from the New York State Department of Health, Office of Health Systems Management for each of the three patients in question. Pltf. Exh. 6–8.

A March 1992 Medicaid Provider Manual submitted by the defendants shows that an entity called "prior authorization" exists and this Manual defines "prior authorization." However, the definition, when compared to the definition of "prior approval," does not indicate that the receipt of "prior authorization" requires that additional steps be taken by the health care facility. Nota-

**3.** Steven C. Adams, Vice President of Marketing & Communications for Horizon Health Care/The Greenery Rehabilitation Group attested in an affidavit that prior approval was received for all three patients in question from the New York State Department of Health following the same process used in obtaining such approval for the over 600 New York City patients treated by the Greenery. His affidavit details the approval process and notes that payment has never been denied by the New York State Department of Social Services or a local social services district on the ground that the Greenery had failed to obtain "prior authorization." Def.Exh. 69.

**4.** Nadira Bujnaktarevic, Izeta Ugljanin's mother, testified at trial that her daughter was being treated at the Greenery in Middleboro, Massa-

chusetts and had previously been treated at the Greenery in Brighton, Massachusetts where she had been covered by Medicaid. She testified that at the time of her daughter's accident she was supporting her financially and there has been no change in Ms. Bujnaktarevic's income or property ownership since that time, nor her daughter's.

**5.** Defendants noted in their post-trial brief that they no longer consider these letters to demonstrate compliance with the alleged requirement of prior authorization. Instead, they have submitted a copy of a regulation enacted in 1988 which they assert requires a separate step of "prior authorization." This regulation is discussed *infra*.

bly, the Provider Manual explains how to request "prior approval," but does not indicate a process for obtaining "prior authorization."[6] Def. Exh. 65. In fact, the definitions appear to show that "prior approval" is the process the health care provider must follow while "prior authorization" is the actual acceptance of financial liability by the Department of Social Services, not a process which the health care provider must follow. *See* Def. Exh. 65 at §§ 2.1.4 & 2.1.5.

The defendants' witness, Bernard J. Noonan, Director of Internal Customer Consulting & Contract Operations for the New York State Department of Social Services, confirmed that the DSS letter dated August 20, 1990, about which Christine Reilly testified, did outline a procedure required by the DSS. Pltf. Exh. 34. He also noted that he did not know what the New York City HRA required for "prior authorization" in 1991 when the three patients in question were admitted to the Greenery facilities. Based on this evidence, defendants have made no showing of what additional steps the Greenery would need to take to obtain "prior authorization" and have not pointed to any source for their assertion that such authorization is required. Thus, based on the evidence provided at trial, the court finds that the plaintiffs did receive all the required approval to accept the patients in question.

■ After trial, defendants also submitted an affidavit by Ronald Speier, an attorney with the New York State Department of Social Services, who supplied copies of regulations applicable to prior approval and prior authorization. N.Y.COMP CODES R. & REGS. tit. 18, § 505.9(b). The version of § 505.9(b) which became effective on February 24, 1988, and remained in effect at the time the three patients were admitted, does use the terms "prior approval" and "prior authorization." It states that "prior approval" must be obtained from the Department of Health while "prior authorization" must be obtained from the relevant local social services official. The regulation does not elaborate, however, on the steps required to obtain "prior approval" and "prior authorization."

The court finds that this regulation does not show that plaintiff failed to obtain the necessary consent because it is clear from the trial testimony that plaintiffs had contact with both the Department of Health and the HRA in the admissions and conversion process for these patients. *See generally* Def. Exh. 69, Aff. of Steven Adams (outlining the process followed for these three patients). Simply put, the defendants have not shown that the plaintiff failed to follow the required steps during the admission and conversion of Medicaid numbers for these patients. They have not shown any evidence as to what the "prior authorization" process was, if any, or how "prior authorization" was to be secured. Thus, Medicaid payments to the plaintiff cannot be denied on the basis that prior authorization for the patients' care was not received.

## V. FACTUAL FINDINGS REGARDING EMERGENCY CARE

### A. Izeta Ugljanin

Supplying testimony[7] as to the condition of Izeta Ugljanin was Dr. Michael C. Randon, who was the attending physician at the Greenery in Middleboro, Massachusetts until November 30, 1994. As attending physician he was familiar with her medical records and treatment. He testified that as the result of a 1991 car accident, Ms. Ugljanin suffered subdural hematoma and injury to the basal

6. The Manual defines "prior approval" as "the process of evaluating the aspects of a plan of care which may be for a single service or an ongoing series of services in order to determine the medical necessity and appropriateness of the care requested." "Prior authorization" is defined as "the acceptance by the local Commissioner of Social Services, or his/her designated representative, of financial liability for a service or a series of services to be rendered by the provider." The Manual notes that "[t]here are certain services which always require prior authorization, e.g., personal care services and non-emergency transportation. The Guidelines Section of this manual specifies which services, if any, require prior authorization." Notably, the defendants have not provided a copy of that section of the Manual.

7. Dr. Randon provided videotaped testimony and a transcript was provided to the court. No live courtroom testimony regarding the emergency care issue was presented by any of the medical witnesses.

ganglia of the brain which caused quadriparesis, a type of spastic quadriplegia in which she is unable to move any of her limbs. She is unable to speak and has difficulty swallowing. From the time of the accident until July 1991, she had a tracheostomy to help her breathe. She has inconsistently been able to blink her eyes in a pattern to indicate yes and no answers to questions and inconsistently she smiles at visitors and cries out when in pain. Due to her difficulty in swallowing, she is fed through a tube inserted into her stomach which must be constantly monitored for signs of infection and to ensure that she is receiving the proper amount of nutrition. Certain medicines are also administered through the tube. Nurses must monitor this tube and change the dressings daily.

When needed, Ms. Ugljanin is administered antacids for indigestion and Tylenol or Ibuprofen for pain. She must also take a muscle relaxant called Baclofen. She receives occupational and physical therapy several times a week. Nurses must bathe her and place her in a padded wheelchair in which she must be restrained. She must be monitored for decubiti and moved approximately every two hours to avoid their occurrence. She is also incontinent and certain creams and barriers must be administered to avoid consequential damage to her skin.

Dr. Randon testified that Ms. Ugljanin cannot feed herself, get out of bed on her own, or bathe herself. It takes two nurses to move her from her bed to her wheelchair where she must be moved regularly to avoid the onset of pneumonia, decubiti, urinary tract infections, and further limb deformities which could result if she was left constantly in bed. Her medications must be closely monitored for side effects. Dr. Randon testified that her brain and central nervous system damage has stabilized and that he could see no reason why she could not, under nursing supervision and in a specialized van, attend certain activities outside the Greenery facility for a few hours at a time. However, he also testified that to take away immediate medical attention would place Ms. Ugljanin's health in jeopardy and result in serious impairments of her bodily functions. He stated

that if treatment was withdrawn she would shortly become unstable. He also testified, after examining the regulation, that she was receiving emergency care within the meaning of that statute.

The defendants called as their medical expert Anne Budin,[8] a nurse who is a Medicaid Review Analyst II for the New York State Department of Social Services, Division of Health and Long Term Care. She observed Ms. Ugljanin on a site visit to the Greenery and reviewed her medical records, but did not physically examine her. She agreed that the Baclofen was necessary to prevent muscle spasms and that her feeding tube needed to be monitored. She agreed that Ms. Ugljanin is totally dependent on nursing assistance for bathing, grooming, dressing, mobility, transfer, eating and toileting and that her care is "medically complex." She stated that not immediately, but eventually, if this care was removed, her health would be placed in serious jeopardy, especially since she requires a feeding tube and total nursing care.

### B. Yik Kan

Dr. John Berry, by way of deposition, testified as to the medical condition of Yik Kan. He acts as an attending physician at the Greenery in Hyannis, Massachusetts and also has a private general internal medicine practice. He has been the attending physician for Yik Kan since he entered that Greenery facility. He testified that due to a beating with a blunt instrument in October 1990, Yik Kan suffered multiple cerebral contusions and hematoma to the right eye orbit. Yik Kan recovered after his initial injuries but these injuries left him with behavioral problems. Dr. Berry testified that Yik Kan had made some progress since entering the Greenery in that he is less aggressive. However, he still physically strikes the staff and other patients, although less often, and becomes physically aggressive in response to frustration. However, physically, he suffers from tardive dyskinesia which is a movement disorder that creates tremors, a slow, shuffling walk and lipsmacking. He is able to walk by himself. He is also legally blind in

8. She too provided only deposition testimony.

the right eye that was hit in the attack. He suffers from a blinding cataract in the left eye, but it is not necessarily related to his beating.

He is administered a variety of medications including Nifedipine (Procardia) and Trandate for heart and blood pressure control, Vasotec for blood pressure, Cogentin for tardive dyskinesia, Melloril for agitation, Ativan as a sleeping aid, and a variety of common drugs such as Tylenol for occasional pain and Maalox for digestion. He also takes Colace for digestion. He attends classes at the Center for Adaptive Learning run by a behavioral psychologist. He is allowed to leave the grounds with supervision.

He is able to feed himself, and use the bathroom, and groom himself. However, he needs to be directed by someone to do these activities. There has been no time since his beating that he has not needed continuous medical care. Dr. Berry testified that, although he is medically stable and he would classify the care he receives as chronic rather than emergency care, without the care currently being provided, Yik Kan's health would be placed in serious jeopardy. Dr. Berry testified that he believed that under the regulatory definition, the Greenery was providing some emergency care to Yik Kan, but did not specify which care he believed fell within the definition.

Anne Budin, the defendants' medical expert, provided deposition testimony regarding Yik Kan's condition. She reviewed the Greenery medical records for Yik Kan and visited him for observation on May 11, 1994, but did not physically examine him in any way. She agreed that the medications he receives require monitoring and noted that the tardive dyskinesia may be a side effect of the Melloril he takes. She noted that she did not know if Yik Kan could bathe, groom, or eat without direction from others. She noted that the decision to discharge Yik Kan would better be left to an attending physician. She agreed that Yik Kan's treatment was medically necessary. She agreed that without the treatment he is receiving, he would eventually suffer health consequences, but she did not believe that it would be the "serious jeopardy" required by the regulation. She noted

that she believed "serious jeopardy" to mean a life or death situation based on her nursing experience. She stated that she believed that, based on his medical records, Yik Kan had received treatment for an emergency medical condition at some time, but she had no opinion as to when that treatment came to an end.

### C. Leon Casimir

Dr. Berry also acts as attending physician for Leon Casimir and testified by deposition as to his medical condition. He has been Mr. Casimir's attending physician for over two and a half years at the Greenery in Hyannis. He testified that, as a result of a gunshot wound, Mr. Casimir suffers from a closed head injury and behavioral problems secondary to the injury. Mr. Casimir suffers from an injury to the frontal lobe of the brain which affects his judgment and his response to his environment. He is unable to walk by himself and requires the assistance of parallel bars and another person to walk short distances. He is mainly confined to a wheelchair where he is restrained by a bar and he wears a splint on his left leg to prevent atrophy. He is able to bathe and use the bathroom with assistance. When presented with food, he can feed himself but cannot get his own food. Often verbally, and sometimes physically, he strikes out when frustrated. Nearly every day, he attends the Center for Adaptive Learning, a facility run by a behavioral psychologist, where he is taught to interact with other patients. Dr. Berry testified that his condition has not changed during his time at the Greenery.

He is treated with Ativan and Melloril, both tranquilizers, when he becomes upset. He takes a multivitamin and a variety of drugs to aid digestion. He also takes Tegretol, an anti-seizure medication, and Lithium which he had been taking prior to entering the Greenery. All these medications require monitoring to avoid side effects and toxicity.

He has received continuous medical care since suffering the gunshot wound. Although Dr. Berry said he would classify Mr. Casimir's care as chronic, he testified that Mr. Casimir's health would be placed in serious jeopardy without the health care he is

receiving. He also testified that he believed that the Greenery was providing some emergency care under the regulatory definition.

Anne Budin also testified as to Mr. Casimir's medical condition by way of deposition. She observed Mr. Casimir at the Greenery facility on May 11, 1994 and reviewed his medical records from the Greenery. She stated that she did not believe any of the care given by the Greenery to be treatment of an emergency medical condition. Again, she testified that she believed the term "serious jeopardy" as used in the regulation to mean a life or death situation. She believed that withdrawal of his medication would not result in immediate harm; it would only occur after the level of medication in his system fell below therapeutic levels.

She agreed that Mr. Casimir was dependent on nursing assistance for grooming, moving to other locations, bathing, dressing, and eating. She agreed that he was incontinent and needed assistance with this problem. She testified that Mr. Casimir had suffered significant brain damage that impairs his ability to care for himself and she would expect him to have great difficulty in doing so. Yet, she did not believe his care to fall within the regulatory definition of emergency care.

## VI. CONCLUSIONS OF LAW REGARDING EMERGENCY CARE

### A. The Tomlinson Deposition

At trial, the court reserved decision on the admissibility of deposition testimony from Robert Tomlinson, a health insurance specialist employed by the Health Care Financing Administration of the Department of Health and Human Services who drafted the federal regulation at issue. As per the discussion at trial, it appears that defendants would offer Tomlinson's testimony to explain the meaning of the applicable federal regulation, 42 C.F.R. § 440.255.

At the end of trial, the parties were directed to submit a two-page letter discussing the legal relevance of Tomlinson's testimony. The plaintiffs have argued in their post-trial brief as to why the testimony should not be admitted. The defendants have submitted the videotape and a transcript of Tomlinson's testimony, but have not supplied any explanation of its relevance. In fact, at the close of evidence at trial, the defendants had not yet determined whether they would seek to admit Tomlinson's testimony as that of an expert or lay witness. In light of defendants' failure to sufficiently explain the relevance of this testimony, the court declines to admit it into evidence.

### B. Application of Statute and Regulation

42 U.S.C. § 1396b(v), which governs Medicaid eligibility for illegal and amnestied aliens, states that medical care and services furnished to such aliens will be covered by Medicaid if "necessary for the treatment of an emergency medical condition" of the alien. 42 U.S.C. § 1396b(v)(2)(A). The statute defines an "emergency medical condition" as:

a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(A) placing the patient's health in serious jeopardy, (B) serious impairment of bodily functions, or (C) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1396b(v)(3).

The corresponding regulation found at 42 C.F.R. § 440.255(b)(1) states that aliens are eligible for:

emergency services required after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in: (i) placing the patient's health in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part.

42 C.F.R. § 440.255(b)(1) (1994).

The question facing the court is whether the three patients at issue are receiving treatment from the Greenery which falls within these statutory and regulatory definitions. On the prior motions for summary judgment,

for which oral argument was held on January 9, 1995, the court implicitly ruled that the common definition of emergency care used in the medical field is not the same as the definition of emergency care established in the statute. *See* Transcript of Proceeding at 6–7 (Jan. 9, 1995).

■ Furthermore, the court stated at oral argument on the motions for summary judgment that the federal regulation which was promulgated pursuant to 42 U.S.C. § 1396b(v) uses substantially the same language as the Medicaid statute with the additional requirement that the medical condition manifests "after [a] sudden onset." 42 C.F.R. § 440.255. The agency purposely did not disturb the broadness of the statutory definition. In response to comments received in connection with the proposed regulation, the agency stated that:

> we believe the broad definition allows States to interpret and further define the services available to aliens covered by section 1903(v)(2) which are any services necessary to treat an emergency medical condition in a consistent and proper manner supported by professional medical judgement. Further, the significant variety of potential emergencies and the unique combination of physical conditions and the patient's response to treatment are so varied that it is neither practical nor possible to define with more precision all those conditions which will be considered emergency medical conditions.

55 Fed.Reg. 36813, 36816 (1990). Great latitude is given to the agency because of potential uncertainties. And accordingly, medical judgment must guide the agency's determination on the issue of whether an alien's condition would fall under section 1396b(v)(3) thus entitling him or her to medicaid benefits. This latitude given to the decision maker is limited only by the parameters of the language of the statute itself. That is, although decisions on whether an emergency medical condition exists must be made on a case by case basis, all determinations in favor of payment must, at a minimum, satisfy the requirements of 42 U.S.C. § 1396b(v)(3). With these standards in mind, we now turn to the specifics of the case at hand.

Essentially, after the summary judgment motions, the only issue for the court to decide is which expert to believe as to whether these patients are receiving emergency care. Unfortunately, the day of live testimony presented to the court was fully consumed by evidence relating solely to the issue of prior authorization. No live testimony was heard in regard to the medical conditions and treatment of these patients. Thus, the court is forced to decide the issue of emergency care based on videotaped deposition testimony.

■ After a careful examination of all the deposition testimony, the court gives greater weight to the testimony of the treating physicians. The court finds that their observations and conclusions about the care received by the three patients are more convincing given their long history of caring for these patients. Their knowledge of the nature and necessity of the care provided is more thorough than that of the state-appointed observer who based her testimony solely on witnessing the patients for no more than one day each without physical examination and on a reading of their medical records. Notably, the testimony of all three medical witnesses was strikingly similar as to the care these patients receive. The only significant differences in the testimony were the legal conclusions drawn by the witnesses, and the court notes that only it can decide the ultimate legal issue, so these conclusions have no binding effect on its determination.

Moreover, because the court did not allow Defendants' Exhibit 84 into evidence except as a tool to understand the deposition testimony of the medical witnesses, it must also dismiss the conclusions by the medical witnesses as to whether in light of the examples listed in paragraphs 33 through 44 of Defendants' Exhibit 84, the three patients were receiving "emergency treatment." Trial Trans., 4/13/95, at 202, 217. Thus, the court may only examine any conclusions made prior to the examination of this Exhibit.

### 1. Izeta Ugljanin

■ The court finds that Izeta Ugljanin's treatment at the Greenery falls within the statutory and regulatory definitions of treatment for an "emergency medical condition."

The car accident in which she sustained her head injuries could certainly be considered a "sudden onset." Dr. Randon testified that he believed Ms. Ugljanin to still be in need of immediate medical attention. It is clear from her condition, as previously described, that she needs continuous care because her medication and feeding must be carefully monitored and she must be moved regularly to prevent such problems as muscle contraction, decubiti, pneumonia and urinary tract infections. Testimony has shown that without the care she is receiving, Ms. Ugljanin would soon become malnourished and dehydrated and likely to develop decubiti, muscle contraction, spasms and a variety of infections. Certainly these problems would place her health in serious jeopardy and seriously impair her bodily functions.

### 2. Yik Kan

■ Yik Kan appears to be in somewhat better health. Relatively speaking, he is less impaired than the other two patients. The testimony showed that he takes a variety of medications which must be monitored. Although he can perform such functions as feeding and grooming himself, the medical testimony shows that he must be directed to do so. He suffers from tardive dyskinesia and is legally blind. Nonetheless, the testimony offered to the court does not permit it to reach the conclusion that Yik Kan is receiving emergency medical treatment within the statutory and regulatory definition.

Although the court finds that the sudden onset requirement is met because the injuries for which he is being treated stem from a severe beating, none of the medical testimony allows the court to reasonably draw the conclusion that the absence of immediate medical attention would result in serious jeopardy to his health, serious impairment of bodily functions or serious dysfunction of any bodily organ or part. It is the immediacy requirement that is most clearly missing. While the court does not in any way suggest that this patient is not in need of continuous medical care, and does not suggest that in the absence of medical attention he would not eventually suffer serious health problems, the court cannot reasonably find that without

immediate medical attention he would be in peril. Thus, the court finds that the Greenery is not providing emergency medical care to Yik Kan within the statutory and regulatory definition.

### 3. Leon Casimir

■ However, the court does not reach the same conclusion as to Leon Casimir. His shooting clearly meets the sudden onset requirement. He is unable to walk by himself. He is mainly confined to a wheelchair where he is restrained by a bar and wears a splint on his left leg to prevent atrophy. He requires assistance to bathe and use the bathroom. He can feed himself but cannot get his own food. His numerous medications require monitoring. Essentially, in the absence of immediate care, he would be left without food, in his own waste, unable to move. According to the medical testimony, this lack of care would place his health in serious jeopardy. Thus, the court finds that the Greenery is providing Leon Casimir with emergency medical care within the statutory and regulatory definitions.

Aside from the particular facts of this case, the court is persuaded to these conclusions by the Arizona case of *Mercy Healthcare Ariz., Inc. v. Arizona Health Care Cost Containment Sys.*, 181 Ariz. 95, 887 P.2d 625 (Ariz.Ct.App.1994). In that case, the Arizona Court of Appeals interpreted the term "emergency medical condition" as it appears under the Arizona Medicaid statute. The definition of "emergency medical condition" under the Arizona statute is the same as the definition used in the federal statute and regulation.

The Court of Appeals interpreted this term in regard to an undocumented alien who had suffered serious head injuries in a car accident and who, after an initial hospital stay, had been transferred to a skilled nursing care facility. At the time the individual entered the skilled nursing care facility he was nonverbal, could not move his lower extremities, was being fed through a gastrointestinal tube and had a tracheostomy. The Court of Appeals overturned the trial court's decision and found that emergency medical care had been provided. The Court of Appeals noted that "contrary to [the

state's] interpretation, the statute does not limit coverage to services for treatment while acute symptoms continue. Rather, the statute requires that the medical condition manifest itself by 'an acute symptom' (including severe pain)." *Id.* 887 P.2d at 628–29.

## VII. CONCLUSIONS OF LAW ON THE THIRD PARTY ACTION

Given these findings, the court now turns to the third party action in which the third-party plaintiffs seek to hold the HHS monetarily liable for a portion of the medical bills these patients have sustained. As the court noted at oral argument on November 8, 1994, when HHS moved to dismiss the third-party action against it, if the court finds that the defendants in the main action must reimburse the Greenery for the cost of caring for these three patients, then HHS will be required to pay a portion of these medical bills. Having found that the defendants in the main action are required to pay for the care that the Greenery is providing to Izeta Ugljanin and Leon Casimir, the court accordingly finds that HHS is required to pay a portion of these costs.

## VIII. CONCLUSION

In summary, the court finds that the Greenery did follow the necessary Medicaid procedures for admitting the three patients and attempting to convert their Medicaid numbers to long term care numbers. The court finds that the Greenery is providing emergency medical care which falls within the statutory and regulatory definitions to Izeta Ugljanin and Leon Casimir. The court finds that the Greenery is not providing such emergency care to Yik Kan. The court accordingly holds that HHS must pay a portion of the costs involved in caring for Izeta Ugljanin and Leon Casimir at the Greenery facilities. In reaching these conclusions the court has not considered the testimony provided by Robert Tomlinson.

**IT IS SO ORDERED.**