BENITO LUNA, ʙʏ ᴘᴇʀsᴏɴᴀʟ ʀᴇᴘʀᴇsᴇɴᴛᴀᴛɪᴠᴇ, MARY JOHNSON, Pᴇᴛɪᴛɪᴏɴᴇʀ ᴠ. DIVISION OF SOCIAL SERVICES ᴀɴᴅ DIVISION OF MEDICAL ASSISTANCE, NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Rᴇsᴘᴏɴᴅᴇɴᴛs

No. COA02-557

(Filed 6 January 2004)

**Public Assistance— Medicaid—undocumented immigrant— emergency medical condition**

A de novo review revealed that the trial court erred by affirming the denial of Medicaid benefits for the treatment of petitioner undocumented immigrant's emergency medical condition including chemotherapy and related services for the rest of the finite course of treatment of the very condition that sent petitioner to the emergency room, and the case is remanded for a determination of some factual issues including: (1) whether petitioner's condition was manifesting itself by acute symptoms; and (2) whether the absence of immediate medical treatment could reasonably be expected to place petitioner's health in serious jeopardy or result in serious impairment to bodily functions or serious dysfunction of any bodily organ or part.

Appeal by petitioner from order entered 14 December 2001 by Judge Melzer A. Morgan, Jr. in the Superior Court in Rockingham County. Heard in the Court of Appeals 13 February 2003.

1

LUNA v. DIVISION OF SOC. SERVS.

[162 N.C. App. 1 (2004)]

*Turner, Enochs & Lloyd, P.A., by Melanie M. Hamilton, Thomas E. Cone, and Wendell H. Ott, for petitioner-appellant.*

*Attorney General Roy Cooper, by Assistant Attorney General Grady L. Balentine, Jr., for respondent-appellants.*

HUDSON, Judge.

Petitioner appeals from an order entered by the superior court, which affirmed the denial of Medicaid coverage. The sole question presented to us is whether the Department correctly applied the law in determining that certain care and services did not constitute treatment for Petitioner's emergency medical condition. For the following reasons, we reverse.

Background

On 26 December 1999, petitioner Benito Luna, an undocumented immigrant from Mexico, arrived at the emergency room at Moses Cone Hospital in Greensboro, North Carolina, complaining of weakness and numbness in the lower extremities, erectile dysfunction, and bladder hesitancy. He was admitted to the hospital that same day for x-rays and an MRI of his thoracic spine. The MRI revealed an intramedullary spinal cord tumor at the T6 level, and doctors originally diagnosed petitioner as having "medullary non-Hodgkin's lymphoma," and later clarified the diagnosis as "thoracic myelopathy with monoplegia in the lower limb and a malignant spinal cord neoplasm." On 28 December 1999, Luna underwent a thoracic laminectomy and resection of the spinal cord tumor.

After the surgery, the petitioner was gradually mobilized and, on 3 January 2000, the hospital transferred him to its rehabilitation unit for a comprehensive rehabilitation program. At the time of petitioner's transfer, 3 January 2000, his diagnosis was the same as in December. During petitioner's ten-day period in the rehabilitation service, the consulting oncologist noted that he had no signs of other disease, but believed that he had a primary central nervous system lymphoma. The pathology report confirmed this diagnosis. The doctor recommended "immediate" treatment to include high doses of chemotherapy.

On 14 January 2000, the rehabilitation service administered a Port-A-Cath to prepare petitioner for chemotherapy, and then transferred him to the hospital's oncology unit for intravenous chemotherapy. The oncology service then administered the treatment from 14

January through 24 January 2000, when petitioner was released to go home. Because the chemotherapy agent used in the course of petitioner's treatment was highly toxic at the doses used, it had to be administered on an inpatient basis. After 24 January 2000, petitioner was readmitted to the hospital for the remaining doses of the chemotherapy treatment plan.

On 28 April 2000, petitioner applied to the Rockingham County Department of Social Services for Medicaid benefits to cover the above admissions. Petitioner gave Moses Cone Hospital permission to act on his behalf and Mary Johnson of Moses Cone Hospital pursued his application for Medicaid benefits.

The Rockingham County DSS ("DSS") approved Medicaid coverage for the first few days of petitioner's initial hospitalization, 26 December 1999 up to 3 January 2000, during which time petitioner underwent the thoracic laminectomy and spinal cord tumor surgery. However, DSS denied Medicaid coverage for all treatment beginning 3 January 2000, determining that it was not for the treatment of a emergency medical condition. Petitioner then appealed to respondent North Carolina Department of Health and Human Services ("the Department"), which held a hearing, and on 23 February 2001, affirmed the decision of Rockingham County DSS. On 26 March 2001, petitioner filed a petition for judicial review in the superior court pursuant to G.S. § 108A-79(k) and Article 4 of Chapter 150B. On 14 December 2001, after hearing arguments from both parties, the superior court affirmed the respondent's final agency decision. Petitioner appeals.

## Analysis

This Court's review of the superior court's order on appeal from an administrative agency decision generally involves "(1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly." *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 675, 443 S.E.2d 114, 118-19 (1994). In *Amanini*, this Court said that "our review of a trial court's order under G.S.§ 150B-52 is the same as in any other civil case—consideration of whether the court committed any error of law." *Amanini*, 114 N.C. App. at 675, 443 S.E.2d at 118-19 (internal quotations and citations omitted); see also G.S. § 150B-43, et. seq. (2001). G.S. § 150B-52, as amended effective 1 January 2001, now provides that, in cases that are not governed by the amended G.S. § 150B-51(c), "[t]he scope of review to be applied by

the appellate court under this section is the same as it is for other civil cases." Put a different way, in other civil cases, in which the superior court sits without a jury,

> the standard of review is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. Findings of fact by the trial court in a non-jury trial . . . are conclusive on appeal if there is evidence to support those findings. A trial court's conclusions of law, however, are reviewable *de novo.*

*Shear v. Stevens Building Co.*, 107 N.C. App. 154, 160, 418 S.E.2d 841, 845 (1992) (internal citations omitted). Here, however, petitioner has not assigned error to any of the findings of fact, which are thus binding. Thus, pursuant to G.S. § § 150B-51 and 108-79(k), we proceed to review the trial court's conclusions of law de novo. See *id.*

A.

"Medicaid is a federal program that provides health care funding for needy persons through cost-sharing with states electing to participate in the program." *Greenery Rehabilitation Group, Inc. v. Hammon*, 150 F.3d 226, 227 (2nd Cir. 1998). A state that chooses to participate in the Medicaid program is required to follow certain federal regulations. In North Carolina, the General Assembly empowered the Department to establish a state Medicaid program, which is administered by county departments of social services under rules adopted by the Department. G.S. § 108A-54 and 108A-25.

The Department's rules regarding eligibility for Medicaid benefits, which are nearly identical to their federal counterparts, provide that "undocumented aliens or aliens not otherwise permanently residing in the United States under color of law generally are not entitled to full Medicaid coverage." N.C. Admin. Code tit. 10, r. 50B.0302 (June 2002); see also 42 U.S.C. 1396b (v)(1), (3). The only exception to this exclusion in both the North Carolina rule and the federal regulations is that payment is authorized for medical "care and services" that are necessary for the treatment of an emergency medical condition. *Greenery*, 150 F.3d at 227-28.

The implementing federal regulation provides, however, that undocumented aliens are entitled to Medicaid coverage for emergency services required after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention

could reasonably be expected to result in: (i) placing the patient's health in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part. 42 C.F.R. § 440.255(b). A state Medicaid plan must conform to these requirements. 42 U.S.C. § 1396a(a).

The North Carolina rule provides coverage:

(c) . . . for care and services necessary for the treatment of an emergency condition if:

(1) The alien requires the care and services after the sudden onset of a medical condition (including labor and delivery) that manifests itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could result in—

(A) Placing the patient's health in serious jeopardy,

(B) Serious impairment to bodily functions, or

(C) Serious dysfunction of any bodily organ or part.

N.C. Admin. Code tit. 10, r. 50B.0302 (June 2002). Thus, North Carolina's rules regarding eligibility for Medicaid coverage are plainly consistent with the federal requirements.

B.

Here, the parties do not dispute that on 26 December 1999, petitioner presented at the hospital with an emergency medical condition. Indeed, the surgical part of the treatment was covered and paid by Medicaid and is not at issue. The issue, rather, is whether the rest of the treatment, the chemotherapy and related services, should have been covered as well. Petitioner contends that we should focus on the term "treatment," and argues that " 'treatment' is more extensive than, and covers a broader range of services than, providing emergency services or just those necessary for the stabilization of a patient's emergency medical condition." The Department, on the other hand, argues that the denial was proper.

The pertinent findings of the court are as follows:

3. Petitioner originally presented himself to the emergency room at Moses Cone Hospital on 26 December 1999 complaining of weakness and numbness in the lower extremities, erectile dys-

function and bladder hesitancy; he was admitted from the emergency room.

4. Petitioner was diagnosed as having medullary non-Hodgkin's lymphoma.

5. On 28 December 1999 Petitioner underwent a thoracic laminectomy and resection of a spinal cord tumor.

6. On 3 January 2000 Petitioner was transferred to the hospital's rehabilitation service for a comprehensive rehabilitation program.

7. On 14 January 2000 a Port-A-Cath was placed to prepare the Petitioner for chemotherapy, and he was transferred to another unit for chemotherapy. Physical therapy also continued.

8. Subsequent admissions covering 1/15-27/00, 1/31/00-2/4/00, 2/21-25/00, 3/6-9/00, 3/20-24/00, and 4/3-6/00 were all for planned courses of chemotherapy.

9. An application for Medicaid was submitted on the Petitioner's behalf on 28 April 2000 to the Rockingham County Department of Social Services.

10. The Respondent approved Medicaid coverage for the 12/26-28/99 admission.

11. The Respondent denied coverage for the subsequent admissions upon its determination that these admissions were not for the treatment of an emergency medical condition.

Based upon these findings and the court's interpretation of applicable law, the court reached the following conclusions:

3. Emergency medical conditions are limited to sudden, severe, short-lived illnesses (and injuries) that require immediate treatment to prevent further harm.          .

4. Emergency medical conditions do not include chronic debilitating conditions resulting from the initial event which later require ongoing regimented care.

5. Treatment for an emergency medical condition does not encompass all medically necessary treatment.

6. The potentially fatal consequences of discontinuing ongoing care, even if such care is medically necessary, does not

transform the Petitioner's condition into an emergency medical condition.

7. The Respondent's final agency decision is consistent with controlling federal statutes and regulations; it is not in violation of constitutional provisions, nor does it exceed the statutory authority or jurisdiction of the agency.

Based upon these conclusions, the court affirmed the Department's denial of coverage. Although we are bound by the findings of fact, we review de novo the legal issues, including whether the findings of fact are adequate to support the conclusions of law. Because we hold that these conclusions and thus the decision are affected by errors of law, and are not consistent with the applicable regulations, we reverse and remand.

The evidence before the court included a number of medical records and other documents contained in the administrative record, as well as a stipulation regarding testimony presented at the hearing before the Department. Among the documents are the hospital summaries and a letter from Dr. Gustav Magrinat, the petitioner's treating physician during the disputed period. In his letter Dr. Magrinat, who is board certified in both hematology and oncology, explained the following:

> Because of the rapid, life-threatening progression of [petitioner's type of] cancer if left untreated, immediate treatment was required . . . . Mr. Luna was fortunate in that we were able to start his chemotherapy during his initial hospitalization.

> The treatment Mr. Luna received included surgical intervention and [six cycles of] chemotherapy.

> . . .

> Medically this therapy is best considered a single course of treatment.

> . . .

> In my opinion, the care and services provided to Mr. Luna from December 26, 1999 through April 6, 2000, all constituted a single course of treatment which was necessary for the treatment of an emergency medical condition as defined in the statute.

Because the tape of the hearing was erased, the parties stipulated to the substance of testimony given by Dr. Mignon Benjamin, a family

practitioner who reviewed petitioner's case under contract with the Department. The parties stipulated that Dr. Benjamin "did not disagree with Dr. Magrinat's letter," although she "considered [petitioner's] admissions [after 3 January 2000] to be 'elective' " and believed that since "he had been stabilized," by that time, any further chemotherapy was not "of an emergency nature." She agreed that such treatment was appropriate and medically necessary, but expressed her opinion that Medicaid should not pay after 3 January 2000, because petitioner "had been stabilized and that an abrupt onset would be necessary for each admission to qualify as an emergency medical condition."

The Department argues that as a matter of law, petitioner's treatment cannot be covered because the chemotherapy constituted "ongoing and regimented care." Indeed, the court, in its conclusion 4, concluded that emergency conditions "do not include chronic debilitating conditions . . . which later require ongoing and regimented care." Whether the treatment at issue here was for the petitioner's emergency condition or for a "chronic debilitating condition" is an issue of medical fact, which neither the court nor the Department addressed in their findings. Although the court's conclusion may be a correct statement of law, its findings are insufficient to support the application of that legal principle here.

Specifically, the Department acknowledged and covered treatment for petitioner's myelopathy and spinal cord malignancy in the emergency room and in the surgical unit as treatment for an emergency medical condition. However, neither the Department nor the court made findings of fact as to whether any of the care and services provided beginning 3 January 2000 were necessary for the treatment of the emergency medical condition for which petitioner was admitted on 26 December 1999. We do not believe that the findings of fact support conclusions of law numbers 3, 4, 5, 6, and 7 (quoted above). While conclusions 3, 4, and 5 may be consistent with the applicable regulations and case law in defining "emergency medical condition," there are no findings at all indicating that petitioner's emergency condition (for which he was admitted on 26 December 1999) had changed in character.

Rather, the medical evidence on this issue was conflicting, and thus subject to resolution by the finder of fact. The factual question to be addressed, therefore, is whether the absence of "immediate medical attention" after 3 January 2000 could result in one or all of the three consequences listed in the regulation. See N.C. Admin. Code

tit. 10, r. 50B.0302(c)(1)(A), (B) and (C) (health in serious jeopardy, serious impairment to bodily function, or serious dysfunction). Because neither the court nor the Department addressed these issues, we must reverse and remand for findings on these issues, and then for conclusions based thereon.

In addition, we do not agree that the superior court's decision is "consistent with controlling federal statutes and regulations." In particular, conclusion of law 6 directly contradicts N.C. Admin. Code tit. 10, r. 50B.0302(c)(1)(A) (treatment covered if "the absence of immediate medical attention could result in placing the patient's health in serious jeopardy"). Neither the Department nor the superior court addressed the central issue required by the regulation, given that petitioner's condition upon admission was admittedly an "emergency medical condition" for which coverage was provided.

The Department further argues that, as a matter of law, the denial of coverage was proper, relying on several cases from other jurisdictions, including *Greenery Rehabilitation Group, Inc. v. Hammon*, 150 F.3d 226 (2d Cir. 1998), *Scottsdale Healthcare, Inc. v. Arizona Health Care Cost Containment System*, 45 P.3d 688 (Ariz. Ct. App. 2002), and *Quinceno v. Dept. of Social Services*, 728 A.2d 553 (Conn. Super. 1999). No court in this jurisdiction has addressed the precise issue here, namely the extent of Medicaid's coverage for "treatment of an emergency medical condition," in the case of an undocumented alien. In each of the cases cited, the petitioners sought coverage for long-term nursing care or open-ended treatment for a chronic condition that resulted many months or years after a traumatic injury. Although we cannot decide on the incomplete findings of fact here whether coverage was proper or not, we can say that none of these cases preclude coverage for this petitioner as a matter of law.

In *Greenery*, the plaintiff was a nursing home rehabilitation facility providing care for three patients who had all experienced traumatic, serious brain injuries three or four years earlier. One patient was injured in a automobile accident 16 June 1991, and was treated for an unspecified period in the hospital until she stabilized, at which point she was transferred to plaintiff's facility where she remained through the time of the hearing in 1995. The court noted that she was "[b]ed-ridden and quadriplegic, she continues to require a feeding tube, continual monitoring and extensive nursing care." *Id.* at 228. Of the second patient, who was shot in 1990 and transferred in 1991, the court noted that he was "unable to walk, requires monitoring and medication for seizures and behavioral problems related to his injury

and needs assistance with daily tasks such as bathing, dressing, eating and toileting." *Id.* at 229. The third patient was assaulted in 1990, treated in New York City and "later" transferred to plaintiff's facility. He is described as follows: "Although he is legally blind as a result of his injuries, he is ambulatory and can function if instructed to accomplish a given task. For example, he can feed himself if instructed to eat and is able to dress or use the toilet if directed to do so. He also suffers from behavioral and psychiatric problems that require medication and monitoring." *Id.* The federal district court determined that the first two patients were entitled to Medicaid as their continuing treatment was emergency medical care, but that the third patient was not. *Greenery Rehabilitation Group, Inc. v. Hammon*, 893 F.Supp. 1195, 1207 (N.D.N.Y. 1995).

The Second Circuit Court of Appeals reversed the district court, concluding that Greenery Rehabilitation was not entitled to reimbursement for providing ongoing daily and regimented care for "chronic debilitating conditions which result from sudden and serious injuries." *Greenery*, 150 F.3d at 231. The court reasoned that because the patients' initial injuries had been treated and that the patients were moved to the rehabilitation facility for long-term nursing care, their medical conditions could no longer be classified as "emergencies," despite the fact that all three patients had emergency conditions originally and even though discontinuing ongoing care could result in grave consequences. As the court elaborated, a chronic medical condition does not become an emergency under the statute simply because discontinuing care may place the patient's life at risk. *Id.* at 232.

In determining that the patients' conditions were "chronic" as opposed to "acute," the *Greenery* Court explained that:

> An acute symptom is a symptom characterized by sharpness or severity . . . having a sudden onset, sharp rise, and short course . . . [as] opposed to chronic. Moreover, as a verb, manifest means to show plainly. In § 1396b(v)(3) this verb is used in the present progressive tense to explain that the emergency medical condition must be revealing itself through acute symptoms. Thus . . . the statute plainly requires that the acute indications of injury or illness must coincide in time with the emergency medical condition. Finally, immediate medical care means medical care occurring . . . without loss of time or that is not secondary or remote. In sum, the statutory language unambiguously conveys the meaning that emergency medical conditions are sudden, severe and

short-lived physical injuries or illnesses that require immediate treatment to prevent further harm.

*Id.* (internal citations and quotation marks omitted). The petitioner here, unlike any of the *Greenery* patients, sought coverage for the rest of the finite course of treatment of the very condition that sent him to the emergency room, and not for long-term or open-ended nursing care. Thus, we conclude that *Greenery* is inapposite. See also *Quinceno*, 728 A.2d 553 (Conn. Super. 1999) (relying upon *Greenery*, the Connecticut superior court affirmed a lower court's decision that the patient's "continuous and regimented" care consisting of end-stage renal dialysis was not treatment for an emergency medical condition); and *Szewczyk v. Dept. of Social Services*, 822 A.2d 957 (Conn. App. 2003) (petitioner not to entitled coverage for emergency condition, where patient presented to family doctor with stomach pain and nausea, and almost a week later received cancer diagnosis from test results, and was admitted for chemotherapy).

Similarly, in *Mercy Healthcare, Inc. v. Arizona Health Care Cost Containment System*, 887 P.2d 625 (Ariz. Ct. App. 1994), an undocumented alien was involved in a single vehicle accident. The patient, who was comatose with a severe closed head injury, was transported to a hospital and treated there. After approximately three weeks, he was transferred to a skilled nursing care facility. At the time of the transfer, he was non-verbal, could not move his lower extremities, had a gastrointestinal tube for feeding, and had a tracheostomy. He was later discharged to his son's care. *Id.* at 627. Mercy sought compensation for the patient's treatment at the hospital and the nursing care facility.

The Arizona Health Care Cost Containment System ("AHCCCS"), the state agency charged with administering Arizona's Medicaid program, authorized payment for the patient's treatment at the hospital, but refused payment beyond that point. In reversing this decision, an Arizona appeals court noted that:

Contrary to AHCCCS's interpretation, the statute does not limit coverage to services for treatment while acute symptoms continue. Rather, the statute requires that the medical condition manifest itself by an "acute symptom (including severe pain)." The statute then mandates that AHCCCS must cover services for treatment of that medical condition so long as absence of immediate treatment for that condition "could reasonably be expected to result in" one of the three consequences defined by statute.

*Id. at* 628-29 (footnote omitted). Based on *Mercy*, petitioner here argues that "once the condition is determined to manifest itself by acute symptoms, then all acute care and treatment necessary to return the individual to a state of health must be covered by the Medicaid program." Subsequent to *Mercy*, however, the Arizona Court of Appeals and Supreme Court revisited this issue. *See Scottsdale Healthcare, Inc. v. AHCCCS*, 45 P.3d 688 (Ariz. Ct. App. 2002), *vacated and remanded*, 75 P.3d 91 (2003).

In *Scottsdale*, an undocumented alien patient fell out of a palm tree, injuring his neck and head, and was rendered partially quadriplegic. He was admitted to Scottsdale Healthcare; two weeks later, after his condition stabilized, he was transferred from the acute care unit to the hospital's rehabilitation unit, where his care consisted primarily of assistance with activities of daily living. AHCCCS paid for services rendered while the patient was in the acute care unit, but denied coverage for any of his rehabilitation-related care.

After *Greenery*, the Arizona Court of Appeals in *Scottsdale* specifically considered and adopted the reasoning of the Second Circuit's ruling in *Greenery*. In doing so, the Court of Appeals in *Scottsdale* distinguished, without overruling, its holding in *Mercy Healthcare*, in determining that the patient's rehabilitation care did not constitute treatment for an emergency medical condition. *Id.* at 691-92. The Arizona Supreme Court, however, vacated the Court of Appeals decision, and remanded for further proceedings. In its decision the Court specifically noted the conflict between *Mercy Healthcare* and *Greenery* regarding the importance of the "stabilization" of the initial condition in deciding whether a patient suffers from an emergency medical condition. The Court explained its rejection of stabilization as pivotal, as follows:

> *Greenery's* reliance on stabilization does not find support in the plain language of the statute. More importantly, we think reliance on the notion of stabilization, at least as applied in these cases, fails to account for either the wide variety of emergency conditions or patients' responses to treatment.
>
> . . .
>
> Thus, . . . a test that simply focuses on stabilization of the initial [condition] to determine when an emergency medical condition ends is impractical. Likewise, basing a decision of whether an emergency medical condition has ended on the type of ward on

which the patient happens to be placed is similarly impractical. Neither the statute's plain language nor its intent contemplates that such a narrow, bright line distinction be drawn between what is an emergency condition and what is not . . .

*Scottsdale,* 75 P.3d at 96-97. Instead, the Court required that "the focus" be on the patient's current medical condition, and whether it is presently manifesting itself by symptoms of sufficient severity that the absence of immediate treatment could result in one of the three adverse consequences listed in the statute. "Whether a condition is manifested" as such is a question of fact, which "should be informed by the expertise of health care providers." *Id.*

We conclude that the analysis by the Arizona Supreme Court is most applicable here, because the statutory language at issue is identical to ours, because the factual context is similar, and because we believe the decision provides the clearest guidance. Thus, based on the available authorities, we remand for the superior court to resolve the critical factual issues, as of the time petitioner sought the services at issue. These issues are: (1) whether his condition was manifesting itself by acute symptoms, and (2) whether the absence of immediate medical treatment could reasonable be expected to place his health in serious jeopardy, or result in serious impairment to bodily functions or serious dysfunction of any bodily organ or part. Depending on the resolution of these factual matters, the court should then decide the legal issue of coverage.

Conclusion

We conclude that the superior court improperly affirmed the denial of Medicaid benefits for the treatment of Petitioner's emergency medical condition, based on the findings of fact in the record. We also conclude that the superior court and the Department have misapplied *Greenery* and the other available authorities in order to deny coverage as a matter of law. Therefore, we vacate the conclusions of law, leave standing the findings of fact of the superior court, and remand for further proceedings consistent with this decision.

Reversed and remanded.

Judges McGEE and STEELMAN concur.