150 F.3d 226
 57 Soc.Sec.Rep.Ser. 537
 The GREENERY REHABILITATION GROUP, INC., Plaintiff-Appellee,
v.
Marva L. HAMMON, as Commissioner of the New York City Human
Resources Administration, City of New York, Brian J. Wing,
as Acting Commissioner of the New York State Department of
Social Services, and Barbara A. DeBuono, as Commissioner of
the New York State Department of Health,
Defendants-Third-Party-Plaintiffs-Appellants,
Donna E. Shalala, as Secretary of the United States
Department of Health and Human Services,
Third-Party-Defendant-Appellant.
 Docket Nos. 97-6236, 97-6238
 United States Court of Appeals,
Second Circuit.
 Argued April 13, 1998.
Decided July 28, 1998.
 
 Hermes A. Fernandez, Bond, Schoeneck & King, LLP, Albany, NY, (Gregory J. Champion, of counsel), for Plaintiff-Appellee.
 Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, New York City (Stephen J. McGrath, Ellen Ravitch, of counsel), for Defendants-ThirdParty-Plaintiffs-Appellants Marva L. Hammon and the City of New York.
 Victor Paladino, Assistant Attorney General of the State of New York, Albany, NY (Dennis C. Vacco, Attorney General of the State of New York, Albany, NY, Peter G. Crary, Assistant Attorney General of the State of New York, Peter H. Schiff, Deputy Solicitor General of the State of New York, Albany, NY, of counsel), for Defendants-ThirdParty-Plaintiffs-Appellants Brian J. Wing and Barbara DeBuono.
 Sushma Soni, United States Department of Justice, Civil Division, Appellate Staff, Washington, DC, (Barbara C. Biddle, United States Department of Justice, Civil Division, Appellate Staff, Washington, DC, Frank W. Hunger, Assistant United States Attorney General, United States Department of Justice, Washington, DC, Thomas J. Maroney, United States Attorney for the Northern District of New York, Syracuse, NY, of counsel), for Third-Party-Defendant-Appellant.
 Before: KEARSE, MINER, Circuit Judges, and KEENAN, District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Defendants - third - party - plaintiffs - appellants the City of New York, Marva L. Hammon, Commissioner of the New York City Human Resources Administration, Brian J. Wing, former Acting Commissioner of the New York State Department of Social Services, Barbara DeBuono, Commissioner of the New York State Department of Health, and third-party-defendant-appellant Donna E. Shalala, Secretary of the United States Department of Health and Human Services, appeal from a declaratory judgment entered in favor of plaintiff-appellee The Greenery Rehabilitation Group, Inc., in the United States District Court for the Northern District of New York (McAvoy, C.J.) after a bench trial. The district court determined that undocumented aliens who suffered serious traumatic head injuries were suffering from "emergency medical condition[s]" within the meaning of 42 U.S.C. § 1396b(v)(3), 42 C.F.R. § 440.255(b)(1) and corresponding New York State regulations, after initial treatment of the injuries. The patients were stable but had chronic debilitating conditions requiring continuous daily care, following initial treatment. Accordingly, the court ordered payment to plaintiff-appellee The Greenery Rehabilitation Group, Inc., a health care provider, pursuant to the Medicaid scheme.
 
 
 2
 For the reasons that follow, we reverse.
 
 BACKGROUND
 
 3
 The underlying facts are carefully set out in the comprehensive opinion of the district court in The Greenery Rehabilitation Group, Inc. v. Hammon, 893 F.Supp. 1195, 1197-99 (N.D.N.Y.1995). We highlight here only the facts most relevant to this appeal, which centers on the interpretation of "emergency medical condition" as set forth in 42 U.S.C. § 1396b(v)(3).
 
 
 4
 Medicaid is a federal program that provides health care funding for needy persons through cost-sharing with states electing to participate in the program. See 42 U.S.C. §§ 1396-1396a; see generally Atkins v. Rivera, 477 U.S. 154, 156-57, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986); Schweiker v. Hogan, 457 U.S. 569, 571, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982). Undocumented aliens or aliens not otherwise permanently residing in the United States under color of law generally are not entitled to full Medicaid coverage. See 42 U.S.C. § 1396b(v)(1) ("no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law"); 42 C.F.R. § 435.406. The only exception to this exclusion is payment for medical assistance that is "necessary for the treatment of an emergency medical condition." 42 U.S.C. § 1396b(v)(2)(A). An "emergency medical condition " is a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
 
 
 5
 (A) placing the patient's health in serious jeopardy,
 
 
 6
 (B) serious impairment to bodily functions, or
 
 
 7
 (C) serious dysfunction of any bodily organ or part.
 
 
 8
 42 U.S.C. § 1396b(v)(3). The corresponding regulation is found at 42 C.F.R. § 440.255(b)(1), which provides that aliens are entitled to Medicaid coverage for
 
 
 9
 [e]mergency services required after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in:
 
 
 10
 (i) Placing the patient's health in serious
 
 
 11
 jeopardy;
 
 
 12
 (ii) Serious impairment to bodily functions; or
 
 
 13
 (iii) Serious dysfunction of any bodily organ or part.
 
 
 14
 A state Medicaid plan must conform with these requirements. See 42 U.S.C. § 1396a(a). New York has chosen to participate in the Medicaid program and has enacted regulations that are substantially the same as those found in 42 U.S.C. § 1396b(v) and 42 C.F.R. § 440.255(b)(1). See N.Y. Comp.Codes R. & Regs. tit. 18, § 360-3.2(f)(2).
 
 
 15
 Plaintiff-appellee The Greenery Rehabilitation Group, Inc., ("GRG") operates nursing homes and rehabilitation facilities where specialized programs are offered for the care of individuals who have suffered brain injuries. GRG operates facilities in several states. Care was and is being provided to the patients involved in this case, following their initial treatment, stabilization and transfer, at facilities located in Brighton, Middleboro, and Hyannis, Massachusetts.
 
 
 16
 GRG has entered into agreements with defendant-third-party-plaintiff New York City Human Resources Administration ("NYCHRA") to admit into GRG's specialized brain injury care programs New York City residents who are in need of its services and are eligible for Medicaid. GRG admitted into its Massachusetts facilities three New York City residents who were in need of such services, but for whom NYCHRA has refused payment because of their alien status. Two of the three patients, Izeta Ugljanin and Leon Casimir, are undocumented aliens. The third, Yik Kan, was granted legal residency in the United States but had not yet met the residency requirements necessary to qualify for Medicaid benefits.
 
 
 17
 All three patients suffered sudden and serious head injuries that necessitated immediate treatment and ultimately left the patients with long-term debilitating conditions requiring ongoing care and daily attention. On June 16, 1991, nineteen-year-old Ugljanin was thrown from a vehicle during an automobile accident and sustained head injuries that caused severe brain damage. Due to her injuries, Ugljanin required immediate care for which she was admitted to Nassau County Medical Center. After being stabilized, Ugljanin was transferred to GRG's Brighton facility in 1991, and was subsequently transferred to GRG's Middleboro facility. Bed-ridden and quadriplegic, she continues to require a feeding tube, continual monitoring and extensive nursing care. At the time this litigation arose, Ugljanin, an immigrant from what is now known as the Republic of Macedonia, fulfilled the criteria for Medicaid coverage but for her alien status.
 
 
 18
 On March 9, 1990, thirty-eight-year-old Casimir, an immigrant from Trinidad, was shot in the head and suffered brain damage. He was initially treated at Goldwater Memorial Hospital in New York City and, after being stabilized, was transferred to GRG's Brighton facility in 1991 and is currently receiving care at GRG's Hyannis facility. Casimir is unable to walk, requires monitoring and medication for seizures and behavioral problems related to his injury and needs assistance with daily tasks such as bathing, dressing, eating and toileting. Casimir was also eligible for Medicaid coverage but for his alien status.
 
 
 19
 In October of 1990, forty-six-year-old Yik Kan, an immigrant from Hong Kong, was attacked and beaten, resulting in cerebral contusions and a hematoma to his right eye. Yik Kan initially received treatment at Harlem Hospital in New York City and was later transferred to GRG's Middleboro facility and has been receiving care at GRG's Hyannis facility since May of 1993. Although he is legally blind as a result of his injuries, he is ambulatory and can function if instructed to accomplish a given task. For example, he can feed himself if instructed to eat and is able to dress or use the toilet if directed to do so. He also suffers from behavioral and psychiatric problems that require medication and monitoring. Like the others, Yik Kan was eligible for Medicaid coverage but for his alien status.
 
 
 20
 Defendant - third - party - plaintiff - appellant Marva L. Hammon served as Commissioner of the NYCHRA at all times relevant to this appeal. As Commissioner, Hammon was responsible for administering the Medicaid program within the five boroughs of the City of New York in accordance with the rules and regulations of the State of New York. Defendant-third-party-plaintiff-appellant City of New York (the "City"), employs Hammon, and is a social services district for administration of the Medicaid program, which must be administered in accordance with the rules and regulations of the State of New York. Defendant-third-party-plaintiff-appellant Brian Wing was Acting Commissioner of the New York State Department of Social Services at all times relevant to this appeal.[1] As such, Wing was responsible for ensuring that the Medicaid program was administered in accordance with the state social services law and the corresponding rules and regulations.
 
 
 21
 Defendant - third - party - plaintiff - appellant Barbara DeBuono is Commissioner of the New York State Department of Health. As Health Commissioner she is responsible for administering the Medicaid program in the State of New York. Third-party-defendant-appellant Donna E. Shalala is Secretary of the United States Department of Health and Human Services ("HHS"). As such, Shalala is responsible for administering the federal Medicaid program.
 
 
 22
 GRG admitted Ugljanin, Casimir and Kan, believing them to be eligible beneficiaries under the Medicaid program in New York State. After Medicaid payment for the treatment of these individuals was denied, GRG commenced the instant action in New York State Supreme Court, seeking (1) a declaration that GRG was providing treatment subject to Medicaid reimbursement under 42 U.S.C. § 1396b(v) and accompanying federal and state regulations and (2) payment for services and care rendered. Hammon, Wing, DeBuono and the City (the "State Appellants"), removed the case to the United States District Court for the Northern District of New York. The State Appellants also served and filed a third-party complaint against the Secretary of HHS seeking partial payment from HHS in the event that the State Appellants were held liable to GRG pursuant to 42 U.S.C. §§ 1396a and 1396b. The Secretary answered, and GRG filed an amended complaint adding claims under the New York State Constitution. The Secretary then moved to have the third-party complaint dismissed, arguing, inter alia, that the district court did not have subject matter jurisdiction. The district court denied the motion. See The Greenery Rehabilitation Group, Inc. v. Sabol, 841 F.Supp. 58 (N.D.N.Y.1993).
 
 
 23
 Following extensive discovery, the State Appellants and GRG made cross-motions for summary judgment. In an oral ruling, the district court found that there were material issues of fact concerning the question of whether the patients were suffering from emergency medical conditions. The district court noted, among other things, that although GRG treating physicians believed that the patients satisfied the statutory definition of an emergency medical condition because the patients would be put at risk without the care provided by GRG, they also concluded that the patients were stable and suffering from chronic conditions rather than what they commonly understood to be emergency medical conditions. The court also indicated that it believed § 1396b(v)(3) should be liberally construed. The district court dismissed the state constitution claims, declining to exercise supplemental jurisdiction.
 
 
 24
 In April 1995, the district court conducted a bench trial on two issues: (1) whether GRG received the necessary prior consent before admitting the patients at issue; and (2) whether GRG provided care for "emergency medical condition[s]" as provided for under § 1396b(v)(3) and corresponding federal and New York State regulations. The district court issued a written Memorandum Decision and Order setting out its findings of fact and conclusions of law. See Hammon, 893 F.Supp. at 1197-1207. With respect to the first issue, the court found that GRG received the required prior approval to accept the patients in question. See id. at 1199-1201. No appeal was taken from this determination.
 
 
 25
 With respect to the "emergency medical condition" issue, the district court in its findings of fact summarized the testimony of attending physicians, Drs. Michael Randon and John Berry, and the State Appellant's expert, Anne Budin.[2] See id. at 1201-04. The court noted that these witnesses generally explained that the patient's initial injuries had been treated and the patients were stabilized prior to being moved to GRG facilities. It also took note of the testimony regarding the extent of the continuing care required by each patient as explained by the witnesses, including the total dependence of Ugljanin and Casimir on nursing care and Ugljanin's reliance on a feeding tube. The injury-related behavioral problems of Kan and Casimir were also discussed, as were the three patients' medication requirements and the necessity for continuous care with respect to activities such as getting out of bed, moving or walking, dressing, feeding, bathing and toileting.
 
 
 26
 The district court concluded that § 1396b(v)(3)'s definition of an emergency medical condition is not the same as the common understanding of what an emergency condition is, and that HHS' adoption of 42 C.F.R. § 440.255 did not narrow the meaning of § 1396b(v)(3). The court relied on a statement released by HHS officials in response to comments concerning § 440.255's adoption to support its conclusion that "emergency medical condition" must be construed broadly. That statement reads:
 
 
 27
 [W]e believe the broad definition [of emergency medical condition] allows States to interpret and further define the services available to aliens covered by section 1903(v)(2) which are any services necessary to treat an emergency medical condition in a consistent and proper manner supported by professional medical judgment. Further, the significant variety of potential emergencies and the unique combination of physical conditions and the patient's response to treatment are so varied that it is neither practical nor possible to define with more precision all those conditions which will be considered emergency medical conditions.
 
 
 28
 55 Fed.Reg. 36,813, 36,816 (1990).
 
 
 29
 Crediting the testimony of the treating physicians, the district court analyzed each patient's situation under its expansive reading of § 1396b(v)(3). The district court found that the circumstances surrounding the patients' head injuries satisfied the "sudden onset" requirement of 42 C.F.R. § 440.225. The court also found that GRG was treating Ugljanin for an emergency medical condition because she required "continuous care" without which her health would be placed in "serious jeopardy and seriously impair her bodily functions." Hammon, 893 F.Supp. at 1206. The court concluded that Casimir was receiving emergency medical care because he required "immediate" nursing care, without which "he would be left without food, in his own waste, unable to move." Id. The district court found that Yik Kan did not satisfy the statutory requirement because the court could not "reasonably find that without immediate medical attention [Yik Kan] would be in peril." Id.
 
 
 30
 The district court was also persuaded by an opinion of the Arizona Court of Appeals holding that the determination of the existence of an "emergency medical condition" does not require that acute symptoms continue but only that the medical condition had initially manifested itself by an acute symptom. See id. at 1206-07 (citing Mercy Healthcare Ariz., Inc. v. Arizona Health Care Cost Containment Sys., 181 Ariz. 95, 887 P.2d 625, 628-29 (1994)). In other words, the district court was persuaded by the holding of the case that a statutory "emergency medical condition" can include a long-term condition resulting from the initial injury even though there are no longer any acute symptoms evidencing that injury. Concluding that Ugljanin's and Casimir's care was being given to treat emergency medical conditions and thus was covered by Medicaid, the district court ruled on the third-party complaint and found that HHS was required to pay a portion of the costs of their care. See id.
 
 
 31
 The judgment was entered on July 25, 1995, and timely appeals followed. After staff counsel for this Court determined that the judgment was not final because it did not specifically address either the claims for retroactive monetary relief or the state law claims, or describe with particularity the extent of HHS' liability, the appeals were withdrawn without prejudice on December 1, 1995 to allow the district court to amend the judgment. On July 17, 1997, the district court filed an order amending the judgment filed on July 25, 1995. A final judgment was filed on July 21, 1997. The State Appellants and third-party-defendant-appellant timely appealed the judgment with respect to Ugljanin and Casimir. GRG does not appeal the judgment with respect to Yik Kan.
 
 DISCUSSION
 
 32
 The issue on appeal is whether the district court erred in determining that Ugljanin and Casimir were receiving care for emergency medical conditions so as to entitle GRG to payment through the Medicaid program. The question is simply whether chronic debilitating conditions that result from sudden and serious injuries, such as those suffered by the patients herein, are "emergency medical conditions" as provided under § 1396b(v)(3).
 
 
 33
 In interpreting a statute, we must first look to the language of the statute itself. See Tom Lange Co. v. Kornblum & Co. (In re Kornblum & Co.), 81 F.3d 280, 285-86 (2d Cir.1996). "[U]nless otherwise defined, individual statutory words are assumed to carry their ordinary, contemporary, common meaning." Burgo v. General Dynamics Corp., 122 F.3d 140, 143 (2d Cir.1997) (quotation and citation omitted) cert. denied, --- U.S. ----, 118 S.Ct. 1839, 140 L.Ed.2d 1089 (1998); see also United States v. Piervinanzi, 23 F.3d 670, 677 (2d Cir.1994). If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words. See Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). "Only where doubt or ambiguity resides in a Congressional enactment ... may legislative history and other tools of interpretation beyond a plain reading of the statute's words" be used. Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1073 (2d Cir.1993). We review the district court's legal interpretation of a statute de novo. See Perry v. Dowling, 95 F.3d 231, 235 (2d Cir.1996).
 
 
 34
 As noted above, aliens who otherwise meet Medicaid requirements but who are not lawfully admitted for permanent residence in the United States, or otherwise permanently residing in the United States under color of law, are not eligible for full federal Medicaid coverage. See 42 U.S.C. §§ 1396a, 1396b(v)(1). Congress did carve out one exception by providing that aliens are entitled to Medicaid coverage only for "such care and services [as] are necessary for the treatment of an emergency medical condition of the alien." 42 U.S.C. § 1396b(v)(2)(A).[3] An "emergency medical condition" is
 
 
 35
 a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
 
 
 36
 (A) placing the patient's health in serious jeopardy,
 
 
 37
 (B) serious impairment to bodily functions, or
 
 
 38
 (C) serious dysfunction of any bodily organ or part.
 
 
 39
 42 U.S.C. § 1396b(v)(3).
 
 
 40
 The appellants argue that the district court erred by failing to heed the plain language of this provision and finding that an "emergency medical condition" includes a condition requiring daily and regimented care for chronic conditions, such as that offered by GRG. We agree.
 
 
 41
 In the medical context, an "emergency" is generally defined as "a sudden bodily alteration such as is likely to require immediate medical attention." Webster's Third New International Dictionary 741 (1981). The emphasis is on severity, temporality and urgency. We believe that 42 U.S.C. § 1396b(v)(3) clearly conveys this commonly understood definition.
 
 
 42
 An "acute" symptom is a symptom "characterized by sharpness or severity ... having a sudden onset, sharp rise, and short course ... [as] opposed to chronic." Id. at 23. Moreover, as a verb, "manifest" means "to show plainly." Id. at 1375. In § 1396b(v)(3) this verb is used in the present progressive tense to explain that the "emergency medical condition" must be revealing itself through acute symptoms. Thus, contrary to the district court's finding, the statute plainly requires that the acute indications of injury or illness must coincide in time with the emergency medical condition. Finally, "immediate" medical care means medical care "occurring ... without loss of time" or that is "not secondary or remote." Id. at 1129. In sum, the statutory language unambiguously conveys the meaning that emergency medical conditions are sudden, severe and short-lived physical injuries or illnesses that require immediate treatment to prevent further harm.
 
 
 43
 The statutory definition is also consistent with the general concept of a medical emergency as commonly understood by those in the medical professions. Dorland's Medical Dictionary defines an emergency as "an unlooked for or sudden occasion; an accident; an urgent or pressing need." Dorland's Illustrated Medical Dictionary 544 (28th ed.1994). Moreover, both of the treating physicians from GRG testified to their general understanding of the concept of care for an emergency medical condition. Dr. Randon defined such care as
 
 
 44
 usually short-lived, care that is given to prevent death or some significant consequence of injury or disease or accident.... The care you g[i]ve to stabilize the patient, I could consider that up to the stabilization as emergency care. To stop [the] bleeding, to put an airway in, that type of care.
 
 
 45
 Dr. Randon testified that Ugljanin was receiving "chronic skill care" from GRG as opposed to what is commonly understood to be emergency medical care.
 
 
 46
 Dr. Berry testified that "[e]mergency treatment is immediate treatment needed to stabilize a patient." He also testified that Kan and Casimir had suffered no "physical emergencies" while at GRG and that they were receiving chronic rather than emergency care. In addition, Ms. Budin testified that her understanding of the concept of an emergency was that it involved a life threatening situation that necessitated urgent medical treatment.
 
 
 47
 The patients' sudden and severe head injuries undoubtedly satisfied the plain meaning of § 1396b(v)(3). However, after the patients were stabilized and the risk of further direct harm from their injuries was essentially eliminated, the medical emergencies ended. This is not to say that the patients could not suffer from a true emergency medical condition while being cared for by GRG. For example, it seems clear that if one of these patients suffered a sudden heart attack, treatment to stabilize the patient would be covered by Medicaid pursuant to § 1396b(v)(3). However, contrary to the reasoning espoused by the district court, such an occurrence would constitute an independent emergency and would not be considered a continuation of the emergency situation brought about by the initial head injury. The district court believed that Ugljanin and Casimir were suffering from emergency medical conditions because it found that the absence of continuous medical attention could reasonably be expected to place their health in serious jeopardy. Although Ugljanin and Casimir undoubtedly require ongoing maintenance care, we have some doubt as to whether their health would be jeopardized by the absence of "immediate medical attention," 42 U.S.C. § 1396b(v)(3) (emphasis added). In any event, however, it is clear that the stable, long-term problems suffered by Ugljanin and Casimir do not meet the additional, independent requirement that the medical condition be manifested "by acute symptoms." Id. Therefore, according to the plain meaning of § 1396b(v)(3), the long-term nursing and maintenance care provided by GRG is not care for an "emergency medical condition" and is not subject to coverage under the Medicaid program.
 
 
 48
 Although our review of the plain meaning of § 1396b(v)(3) ends our inquiry, we note that we do not believe that 42 C.F.R. § 440.255 or its history provide any support for the conclusion that the statutory definition of an emergency medical condition must be given a distinct and more liberal meaning than what is commonly understood to be a medical emergency. Section 440.255 essentially mirrors § 1396b(v)(3). The related commentary relied upon by the district court establishes only that emergency medical conditions can involve a wide variety of injuries and illnesses that might require diverse treatment approaches. There is no indication that Congress (or HHS) intended that an "emergency medical condition" should include conditions such as Casimir's and Ugljanin's, which require ongoing and regimented care.
 
 CONCLUSION
 
 49
 The statutory language of 42 U.S.C. § 1396b(v)(3) is plain in its meaning. An "emergency medical condition" must be manifested by acute, rather than chronic symptoms. It must necessitate immediate medical treatment, without which the patient's physical well-being would likely be put in jeopardy or serious physical impairment or dysfunction would result. Accordingly, we reverse the judgment of the district court and hold that the continuous and regimented care given to the patients at issue here is not treatment for emergency medical conditions as provided for under 42 U.S.C. § 1396b(v). Consequently, payment for the care provided for Ugljanin and Casimir is not afforded under the Medicaid scheme.
 
 
 
 *
 The Honorable John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Effective April 1, 1997, the New York State Department of Social Services was renamed the Department of Family Assistance. See 1997 N.Y. Laws ch. 436, pt. B, §§ 122-124, 130-131, 138. Wing is now the Commissioner of Temporary and Disability Assistance, an autonomous office within the Department of Family Assistance. See id. at § 122
 
 
 [2]
 Ms. Budin is a Registered Nurse and is employed by the State of New York as a Medicaid Review Analyst for the Department of Social Services' Division of Health and Long Term Care
 
 
 [3]
 42 U.S.C. § 1396b(v)(2)(C) completely excludes from coverage "care and services ... related to an organ transplant procedure."