MEMORANDUM OF DECISION
Pursuant to General Statutes §§ 17b-61 and 4-183, the plaintiff, Gladys Corbett, appeals from a final decision by the defendant, Department of Social Services ("DSS"), denying the plaintiff's Medicaid application for her son Harlen Valenzuela.
The record indicates the following pertinent facts. The plaintiff and her son are natives of Peru. Harlen entered the United States illegally in 1994. (Return of Record ("ROR"), Volume I, pp. 4, 23, 125; ROR, Volume II, p. 37.) Harlen first became ill in August of 1997. (ROR, Volume II, p. 25.) The plaintiff testified that approximately five weeks prior to the hospitalization at issue in this appeal, Harlen suffered from a painful, CT Page 9333 swollen wrist. (ROR, Volume II, p. 25.)
Harlen also had an eight pound weight loss during this period. (ROR, Volume I, p. 74.) He complained of intermittent limb pain and experienced pain in various limbs for several hours at a time. (ROR, Volume I, p. 74; ROR, Volume II, p. 28.) Harlen saw his regular physician who indicated that his symptoms could be growing pains. (ROR, Volume II, p. 25.) During this period, he experienced some fever and chills at night. (ROR, Volume I, p. 74; ROR, Volume II, p. 30.) The plaintiff took Harlen to another physician during the first week of September 1997. (ROR, Volume II, p. 29.) Harlen saw his pediatrician again on or about September 14, 1997. (ROR, Volume I, p. 74.) A number of tests were performed on Harlen but no diagnosis was made. (ROR, Volume I, p. 74.)
At Harlen's pediatrician's instruction, the plaintiff took Harlen to the Yale-New Haven Hospital emergency room on September 18, 1997. Harlen underwent a physical examination and a bone marrow biopsy at the hospital and was admitted to the hospital for further care. (ROR, Volume I, p. 75.) On September 19, 1997, the bone biopsy revealed that Harlen had acute lymphocytic leukemia. (ROR, Volume I, p. 74.) Harlen started on chemotherapy on September 20, 1997 at the hospital. He was discharged from the hospital on September 28, 1997. (ROR, Volume I, p. 74.) Harlen's physician estimated that he would need a two year course of treatment following this hospitalization. (ROR, Volume I, p. 269.)
Subsequently, on December 31, 1997, the plaintiff filed an application with DSS to qualify for Medicaid, the federal program under Title XIX of the Social Security Act, and General Statutes §§ 17b-2, 17b-260, to cover the ten-day hospitalization amounting to $70,997. DSS denied the plaintiff's application and the plaintiff proceeded to a fair hearing on May 4, 1998. The DSS fair hearing officer concluded that at the time of the plaintiff's application, Harlen was not an eligible non-citizen for purposes of Medicaid eligibility. (ROR, Volume I, p. 3, ¶ 7.)
The fair hearing officer further found that Harlen was diagnosed with leukemia on September 19, 1997 and began a chemotherapy regimen on September 20, 1997. (ROR Volume I, p. 3, ¶ 13.) The fair hearing officer concluded that the admission to Yale-New Haven Hospital on September 18, 1997 was not an emergency situation and affirmed the denial of coverage. (ROR, Volume I, pp. 3, 5.)
At the outset, the court notes the "standard of review for all of the plaintiff's claims on appeal. Because [the court is] reviewing the decision of an administrative agency, [the court's] review is highly deferential. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered CT Page 9334 by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . ." (Citations omitted; internal quotation marks omitted.) Bezzini v. Dept. of Social Services, 49 Conn. App. 432, 436 (1998).
The first issue to be considered, because it is jurisdictional, is aggrievement. The plaintiff must both plead and prove aggrievement.Bakelaar v. West Haven, 193 Conn. 59, 65 (1984). DSS questions the aggrievement of the plaintiff because Yale-New Haven Hospital has not billed or taken a collection action against the plaintiff for its services. Her injury is claimed to be speculative. The hospital, however, carries a bill in excess of $70,000 as an open account with the plaintiff listed as a guarantor. (ROR, Volume I, p. 72.) Collection by way of billing and negotiation over payment has been deferred during the pendency of this appeal. Under these circumstances, the court concludes that the plaintiff has proven aggrievement. Bethlehem ChristianFellowship, Inc. v. Planning Zoning Commission, 58 Conn. App. 441, 444
(2000): "Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest has been adversely affected." (Citations omitted.)
Turning to the merits of the plaintiff's appeal, much of the legal issues here have been addressed by the courts in the cases of GreeneryRehabilitation Group, Inc. v. Hammon, 150 F.3d 226 (2d Cir. 1998) (interpreting 42 U.S.C. § 1396b(v)) and Quiceno v. Department ofSocial Services, 45 Conn. Sup. 580 (1999) (interpreting federal law and the state regulations, as found in the Uniform Policy Manual of DSS.)[2]
The court agrees with both cases holding that an undocumented alien[3]
is only entitled to Medicaid for an "emergency medical condition." The court also finds the language in Quiceno v. Department of SocialServices, supra, persuasive. In that case, the court stated that "[t]he fatal consequences of the discontinuance of . . . ongoing care does not transform into emergency medical care." Id., 585.
In Greenery, this meant that patients that had suffered severe and traumatic brain injury were not eligible for long-term continued treatment at a nursing home. This was true even if the failure to provide continued care would result in serious consequences for the patient. The CT Page 9335 court, in Quiceno, declared an alien ineligible for receiving "continuous and regimented care by dialysis," even though she was in end-stage renal failure. The hearing officer captured the holdings of these cases in defining "emergency" under Medicaid to mean "urgent medical treatment." (ROR, Volume I, p. 5.)
Here, Harlen's diagnosis of leukemia led to his admission to the hospital and a period of treatment both during hospitalization and continuing after his release on September 28, 1997. The charges sought for reimbursement fall in large measure under the general rule discussed above. Applying Greenery, Harlen was entitled to Medicaid until the "direct harm," if any, that brought him to the emergency room was eliminated, but was not entitled to governmental support for the treatment for leukemia, even if his life was at risk. GreeneryRehabilitation Group, Inc. v. Hammon, supra, 150 F.3d 232. Therefore, the court must address the initial days of hospital care, until the regular, continuous leukemia treatment began.
In Greenery, the initial traumatic injuries were covered by Medicaid. "The patients' sudden and severe head injuries undoubtedly satisfied the plain meaning of § 1396b(v)(3)." Greenery Rehabilitation Group, Inc.v. Hammon, supra, 150 F.3d 232. In this case, Harlen was admitted to the emergency room unable to walk, having a high fever, in a great amount of pain and in need of a blood transfusion and antibiotics. (ROR, Volume I, Dr. McIntosh's Letter, p. 268.) The hearing officer found that the diagnosis was made the day following Harlen's initial appearance at the emergency room and that the chemotherapy began on the second day, September 20, 1997. (ROR, Volume I, p. 3.)
The federal law, as set forth in Greenery and binding on this court,[4]
retains as a definition of "emergency" what is "commonly understood" to be a medical emergency. Greenery Rehabilitation Group, Inc. v. Hammon,
supra, 150 F.3d 233.
The court would not limit an emergency to the examples given by the hearing officer, namely cardiac arrest, severe asthma attach, or bullet wound. (ROR, Volume I, p. 5.) The court would expand the definition toany condition that is of such severity that in the absence of immediate medical attention, the patient's health would be placed in serious jeopardy. UPM § 3000.01. "Ultimately, the question is not whether the trial court would have reached the same conclusion [as the hearing officer] but whether the record before the [DSS] supports the action taken." Hospital of St. Raphael v. Commission on Hospitals HealthCare, 182 Conn. 314, 318 (1980).
Looking at the record as a whole, Sampieri v. Inland Wetlands Agency,
CT Page 9336226 Conn. 579, 587 (1993), there is substantial evidence to conclude that Harlen's initial visit to the Yale-New Haven Hospital was not an "emergency." In the discharge summary and in the subsequent medical records, Harlen is described as not in acute distress. (ROR, Volume I, pp. 74, 77-79.) Based upon the record as a whole, the court does not find that the conclusion of the hearing officer that Harlen entered the emergency room to have his diagnosis confirmed arbitrary, illegal or an abuse of discretion. (ROR, Volume I, p. 5.) The court will not substitute its judgment for that of the hearing officer as to the weight of the evidence or matters of credibility.
Accordingly, the appeal is dismissed.
Henry S. Cohn, Judge