SPRING CREEK MANAGEMENT, L.P., d/b/a Spring Creek Rehabilitation and Health Care Center, Petitioner

v.

DEPARTMENT OF PUBLIC WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 16, 2012.

Decided June 8, 2012.

Trisha Cowart, New York, NY, and Kirk S. Sohonage, Harrisburg, for petitioner.

Lisa B. Dees, Assistant Counsel, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and SIMPSON, Judge, and COLINS, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Spring Creek Management, L.P., d/b/a Spring Creek Rehabilitation and Health Care Center (Spring Creek) petitions for review from the Order of the Department of Public Welfare (Department) affirming the Order and Adjudication of an Administrative Law Judge (ALJ) that denied Spring Creek's appeal from the denial of Medical Assistance (MA) Long Term Care (MA/LTC) benefits for its patient, W.T., an undocumented alien, by the Dauphin County Assistance Office (CAO). On appeal, Spring Creek argues that W.T. was improperly denied benefits under Section 150.11 of the Department's regulations, 55 Pa.Code § 150.11 (pertaining to the availability of MA benefits for undocumented aliens where the benefits are for the care and treatment of an emergency medical condition), because W.T. is suffering from an emergency medical condition.

W.T. suffered a stroke in June 2010, for which she was hospitalized until September 2010. On September 16, 2010, W.T. entered Spring Creek and, on September 29, 2010, Spring Creek submitted, on her behalf, an application for MA/LTC benefits to the CAO. The CAO requested proof of W.T.'s emergency medical condition by let-ter dated December 9, 2010, and Spring Creek sent the CAO additional documentation on December 13, 2010. By notice mailed April 13, 2011, the CAO denied the requested MA/LTC benefits because it determined that no emergency medical condition existed and, therefore, W.T. was ineligible for assistance. Spring Creek timely appealed to the Bureau of Hearings and Appeals (BHA), and the ALJ held a hearing. (ALJ's Findings of Fact (FOF) ¶¶ 1–8.)

At the hearing, the CAO's Income Maintenance Caseworker Supervisor (Supervisor) testified, in relevant part, that once the CAO received the additional documentation of W.T.'s condition, it forwarded that information to the Bureau of Policy (BOP) and Office of General Counsel (OGC) for a determination of W.T.'s eligibility. Supervisor explained that, based on the reports from Spring Creek and a report by the CAO's own physician, the CAO could not open MA/LTC benefits for W.T. because she is in a stable condition and no emergency medical condition currently exists. (ALJ's Adjudication at 3; ALJ Hr'g Tr. at 19–22, R.R. at 115a–18a.)

Spring Creek's Chief Clinical Officer (Clinical Officer), who has been a registered nurse for twenty-seven years, testified about W.T.'s treatment in the hospital and that, when W.T. entered Spring Creek, she had "an aggregate of very severe chronic conditions, including skin breakdown as a result of her immobility, severely impaired mobility. She's incontinent to both bowel and bladder. She's severely hypertensive if she doesn't take her medications." (ALJ Hr'g Tr. at 26, R.R. at 122a.) Clinical Officer stated that W.T. was unable to swallow when she entered Spring Creek, but could now swallow puréed food, and that any liquids had to be thickened to avoid choking and aspiration. According to Clinical Officer, W.T. contin-

ues to have impaired mobility, but can get around in a wheelchair using one arm, and is at risk for pressure sores, infections, or fractures due to her immobility and "cantankerousness." (ALJ Hr'g Tr. at 27, R.R. at 123a.) Clinical Officer indicated that W.T. would require indefinite treatment and that, if W.T. did not receive treatment, she would be at risk of another stroke, choking, and additional medical problems, including death.[1] (ALJ Hr'g Tr. at 26–29, R.R. at 122a–25a.)

The ALJ credited Clinical Officer's testimony that W.T. required nursing facility level of care, but not Clinical Officer's testimony that W.T. needs ongoing treatment for her stroke. (FOF ¶¶ 10–11.) Citing the definition of "emergency medical condition" found at Section 150.2 of the Department's regulations, 55 Pa.Code § 150.2, and the Department's Operations Memorandum 040301 (Operations Memo), which provides that ongoing treatment may be available in certain circumstances, the ALJ held that "no testimony was provided to show what treatment is still needed directly related to [W.T.'s] stroke" and that Clinical Officer's testimony was regarding the care W.T. "needs as a result of her stroke." (ALJ Adjudication at 5.) The ALJ concluded that Spring Creek's treatment and care of W.T. was not ongoing treatment for an emergency medical condition, i.e., the stroke itself, and, therefore, the CAO properly denied the request for MA/LTC benefits. Spring Creek appealed to the BHA, which affirmed the ALJ's Order. Spring Creek now petitions this Court for review.[2]

This case presents an issue of first impression for this Court: under what circumstances does an emergency medical condition continue, and when does the emergency end, such that an undocumented alien's treatment is no longer eligible for MA pursuant to federal and state law. In pertinent part, Section 150.11 of the Department's regulations sets forth the following:

(a) An alien who has an emergency medical condition as defined in § 150.2 (relating to definitions) and who meets the income, resource and other categorical requirements of the applicable MA program may be eligible for MA for the treatment of the emergency medical condition if the alien:

. . . .

(3) Is an undocumented alien.

. . . .

(d) An alien who had an emergency medical condition is required to provide at application verification of the emergency by presenting a written statement from the medical provider that specifies the following:

(1) The nature of the emergency medical condition.

(2) That the medical treatment was necessary because of the emergency condition.

(3) The approximate duration of the emergency.

(e) The emergency medical services required to treat an emergency medical condition are only funded by MA until the medical condition is no longer an emergency. MA funded medical ser-

---

1. Additionally, Spring Creek's Billing and Collection Manager testified that W.T. was employed prior to suffering her stroke, her only source of income was from her employment, and she had no assets. (ALJ Hr'g Tr. at 33, R.R. at 129a.)

2. This Court's "review is limited to determining whether an error of law was committed, whether constitutional rights were violated or whether necessary findings of fact are supported by substantial evidence." *Gray v. Department of Public Welfare*, 903 A.2d 647, 651 n. 4 (Pa.Cmwlth.2006).

vices are not available for treatment received after the emergency ends.

55 Pa.Code § 150.11. Section 150.2 of the Department's regulations defines, in relevant part, the following terms:

Emergency medical condition—A medical condition . . . manifesting itself by acute symptoms of sufficient severity including severe pain so that the absence of immediate medical attention could reasonably be expected to result in one of the following:

(i) Placing the patient's health in serious jeopardy.

(ii) Serious impairment to bodily functions.

(iii) Serious dysfunction of a bodily organ or part.

. . . .

Undocumented alien—An alien who does not have, and has never been given, any type of INS documentation. These aliens are eligible for emergency medical services only.

55 Pa.Code § 150.2.

These regulations are in accordance with Section 1396b(v) of title XIX of the Social Security Act (SSA), 42 U.S.C. § 1396b(v).[3] In *Arellano v. Department of Human Services,* 402 Ill.App.3d 665, 348 Ill.Dec. 23, 943 N.E.2d 631, 636 (2010), the Illinois Appellate Court described the history of the availability of benefits to undocumented aliens under the SSA:

In 1965, title XIX of the [SSA] (42 U.S.C. §§ 1396 through 1396v (1994)) established Medicaid, "a federal program that provides health care funding for needy persons through cost-sharing with states electing to participate in the program." *Greenery Rehabilitation Group, Inc. v. Hammon,* 150 F.3d 226, 227 (2d Cir.1998). To participate in the federal Medicaid program, states must "abide by federal statutory law governing Medicaid reimbursement" or "risk losing Medicaid reimbursement from the federal government for that payment." *Diaz v. Division of Social Services,* 360 N.C. 384, 628 S.E.2d 1, 3 (2006).

When it was passed in 1965, the Medicaid statute was silent as to whether it provided benefits to undocumented

---

**3.** Section 1396b(v) of the SSA provides, in relevant part:

Medical assistance to aliens not lawfully admitted for permanent residence

(1) Notwithstanding the preceding provisions of this section, except as provided in paragraphs (2) and (4), no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law.

(2) Payment shall be made under this section for care and services that are furnished to an alien described in paragraph (1) only if—

(A) such care and services are necessary for the treatment of an emergency medical condition of the alien,

(B) such alien otherwise meets the eligibility requirements for medical assistance under the State plan approved under this subchapter (other than the requirement of the receipt of aid or assistance under subchapter IV of this chapter, supplemental security income benefits under subchapter XVI of this chapter, or a State supplementary payment), and

(C) such care and services are not related to an organ transplant procedure.

(3) For purposes of this subsection, the term "emergency medical condition" means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-

(A) placing the patient's health in serious jeopardy,

(B) serious impairment to bodily functions, or

(C) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1396b(v)(2), (v)(3).

aliens. *Lewis v. Thompson*, 252 F.3d 567, 571 (2d Cir.2001). However, in 1986, in response to a federal court ruling that denial of Medicaid coverage to an illegal alien violated the Medicaid statute (*see Lewis v. Gross*, 663 F.Supp. 1164 (E.D.N.Y.1986)), Congress incorporated restrictions on benefits to aliens, via the Omnibus Budget Reconciliation Act of 1986 (OBRA 1986) (Pub.L. No. 99–509, 100 Stat. 1874 (1986)). *See Lewis*, 252 F.3d at 573–74. Pursuant to OBRA 1986, the Medicaid statute now provides, with two exceptions, that "no payment may be made to a State [under Medicaid] for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." 42 U.S.C. § 1396b(v)(1) (2006). The policy underlying this provision of OBRA 1986 has been explained as attempting to serve both "a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits' " (*Diaz*, 360 N.C. at 390, 628 S.E.2d at 5, quoting 8 U.S.C. § 1601(6) (2000)) and "the clear purpose ... to make government more cost-effective" (*Lewis*, 252 F.3d at 576).

*Arellano*, 348 Ill.Dec. 23, 943 N.E.2d at 636. The Second Circuit and multiple state appellate courts have interpreted Section 1396b(v) and/or their own state statutes or regulations that mirror, as Section 150.11 does, Section 1396b(v) to determine the boundaries of the provision of emergency medical services to undocumented aliens. We look to those cases for guidance in considering this issue of first impression in Pennsylvania.

In *Greenery*, the United States Court of Appeals for the Second Circuit considered whether three undocumented aliens, who had suffered serious traumatic head injuries for which they had been transferred to nursing homes or rehabilitation facilities once their conditions had stabilized, were suffering from an emergency medical condition under Section 1396b(v)(3). *Greenery*, 150 F.3d at 227–28. Each patient had "suffered sudden and serious head injuries that necessitated immediate treatment and ultimately left the patients with long-term debilitating conditions requiring ongoing care and daily attention."[4] *Id.* at 228. The District Court found that two of the three patients were receiving treatment for emergency medical conditions and were eligible for benefits, accepting the testimony of the patients' physicians that, without the provided care, their health would be placed in serious jeopardy and their bodily functions would be seriously impaired. *Id.* at 230–31. The Second Circuit reversed, declaring the statutory term "emergency medical condition" to be clear and unambiguous. *Id.* at 233. The Second Circuit Court explained the language as follows:

> In the medical context, an "emergency" is generally defined as "a sudden bodily alteration such as is likely to require immediate medical attention." Webster's Third New International Dictionary 741 (1981). The emphasis is on severity, temporality and urgency. We believe that 42 U.S.C § 1396b(v)(3)

---

4. Of the three patients: one was rendered quadriplegic, was bedridden, and "require[d] a feeding tube, continual monitoring and extensive nursing care"; a second was "unable to walk, require[d] monitoring and medication for seizures and behavioral problems related to his injury and need[ed] assistance with daily tasks such as bathing, dressing, eating and toileting"; and the third was legally blind as a result of his condition, but was "ambulatory and [could] function if instructed to accomplish a given task." *Greenery*, 150 F.3d at 228–29.

clearly conveys this commonly understood definition.

An "acute" symptom is a symptom "characterized by sharpness or severity ... having a sudden onset, sharp rise, and short course .... [as] opposed to *chronic*." [Webster's Third New International Dictionary] at 23. Moreover, as a verb, "manifest" means "to show plainly." *Id.* at 1375. In § 1396b(v)(3) this verb is used in the present progressive tense to explain that the "emergency medical condition" must be revealing itself through acute symptoms.

*Id.* at 232 (emphasis in original). The Second Circuit concluded that the acute symptoms had to correspond in time with the emergency medical condition and that the patients in *Greenery* had stabilized and were now receiving "chronic skill care" rather than emergency medical care. *Id.* Additionally, the Second Circuit questioned whether the health of the two more severely disabled patients "would be jeopardized by the absence of *immediate* medical attention.'" *Id.* at 233 (quoting 42 U.S.C. § 1396b(v)(3)) (emphasis in original).

In *Scottsdale Healthcare, Inc. v. Arizona Health Care Cost Containment Administration*, 206 Ariz. 1, 75 P.3d 91 (2003), the Supreme Court of Arizona

agreed with *Greenery*[5] that the key to whether an emergency medical condition existed was the term "acute." *Id.* at 97. The Arizona Supreme Court concluded that the symptoms manifesting an emergency medical condition "must not only have arisen rapidly, but, more importantly, that they be short-lived. In other words, *a medical condition manifesting itself by chronic symptoms is not an emergency medical condition, even though the absence of medical care might lead to one of the three adverse consequences listed [in] the statute*." *Id.* at 97 (emphasis added).

In *Szewczyk v. Department of Social Services*, 275 Conn. 464, 881 A.2d 259 (2005), the Supreme Court of Connecticut addressed the issue of whether an undocumented alien, who suffered from acute myelogenous leukemia, had an emergency medical condition and would be eligible for Medicaid reimbursement. The patient presented to his family physician with "intense pain, nausea and overall weakness so severe that he could only take one or two steps before collapsing" and was immediately referred to an oncologist. *Id.* at 262. On the same day the patient was referred to the oncologist, he was diagnosed with acute myelogenous leukemia and admitted to the hospital for chemotherapy, surgery, and biopsies until his discharge about a

---

5. Although not affecting its general agreement with the approach in *Greenery*, the Supreme Court of Arizona questioned *Greenery's* reliance on "stabilization" as the sole factor in determining when treatment ceases to be for an emergency medical condition, finding it was not supported by the plain language of Section 1396b(v)(3). *Scottsdale*, 75 P.3d at 96–97. For example, the Arizona Supreme Court in *Scottsdale* pointed out that, in one of the cases before it, the patient who had a gaping abdominal wound and who had been transferred between a hospital's acute and sub-acute rehabilitation units multiple times during his hospitalization, had been denied benefits for the time he was in the sub-acute unit, despite the fact that he still required and received "life-sustaining, immediate medical treatment, the denial of which would have been reasonably expected to place his health in serious jeopardy." *Id.* at 97. Thus, the Arizona Supreme Court concluded that, "even though an initial injury may be stabilized," the emergency condition may still exist and that "the focus must be on the patient's current condition and whether that condition satisfies the criteria" of emergency medical condition. *Id.* Because the Arizona Court of Appeals had focused on whether the patients had stabilized as the sole factor in determining benefit eligibility, the matter was remanded to the lower court to apply the test as modified by the Supreme Court of Arizona. *Id.* at 98.

month later. The oncologist wrote a letter in support of the application for benefits that stated the patient's cancer "is a rapidly fatal disease unless treated aggressively with chemotherapy," the chemotherapy used for this form of cancer "is always administered in a hospital [because it is] associated with severe infections requiring aggressive antibiotics and transfusion treatment, and that 'in the absence of such therapy, [the patient] would probably not be alive today.' " *Id.* (emphasis omitted). The trial court found that no emergency medical condition existed because he would not have immediately died, and the intermediate appellate court affirmed. On appeal, the Supreme Court of Connecticut reversed holding that the lower courts had applied the *Greenery* standard too narrowly. *Id.* at 265. The Connecticut Supreme Court held that, beyond the analysis in *Greenery*, "the plain language of [Section] 1396b(v) indicates that the statute encompasses payment for care beyond that which is immediately necessary to stabilize a patient."[6] *Id.* at 271. Noting that the patient in *Szewczyk* sought coverage for "the finite course of treatment of the very condition that sent him to the emergency room, and *not for long term or open-ended nursing care,*' " *Luna v. Division of Social Services,* 162 N.C.App. 1, 589 S.E.2d 917, 923 (2004) (emphasis added), the Connecticut Supreme Court held that the patient's treatment and care was related to an emergency medical condition and was covered. *Szewczyk,* 881 A.2d at 272.

In contrast, in *Diaz,* the Supreme Court of North Carolina reversed the de-

cision of the Court of Appeals of North Carolina in which the latter held that an undocumented alien's chemotherapy treatment was treatment for an emergency medical condition. *Diaz,* 628 S.E.2d at 2. The patient was diagnosed with acute lymphocytic leukemia, which initially was treated at a hospital. *Id.* Later, the patient underwent chemotherapy intermittently for approximately a year and a half. *Id.* The patient, through his provider, sought coverage for his chemotherapy as treatment for an emergency medical condition, which the state agency denied. *Id.* The patient appealed, and the denial was reversed. On appeal to the North Carolina Supreme Court, that Court rejected, based on *Greenery,* and the plain language of Section 1396b(v), the patient's argument that any treatment necessary to cure the underlying cause of an emergency medical condition is covered under Section 1396b(v). *Id.* at 4. Rather, the North Carolina Court focused on the need for "immediate intervention to prevent the occurrence of any of the three statutorily enumerated results." *Id.* Distinguishing the matter before it from *Szewczyk,*[7] the North Carolina Court held that, unlike in *Szewczyk,* "there [was] nothing in the record that indicated the prolonged chemotherapy treatments must have been immediate' to prevent the statutorily enumerated results." *Id.* Rather, the Supreme Court of North Carolina cited the testimony of the state agency's physician who opined that, although the lack of chemotherapy treatment would eventually cause the patient to regress "into a state

---

6. The Supreme Court of Connecticut relied on the language in Section 1396b(v) that excludes organ transplant procedures, which it concluded were time-consuming and required lengthy hospital stays, as evidence that the intent of the United States Congress was not to limit benefits to short-term stabilization because, otherwise, the proscription on trans-

plant procedures would be superfluous. *Szewczyk,* 881 A.2d at 271–72.

7. The Supreme Court of North Carolina rejected that part of the *Szewczyk* holding that would have expanded the availability of medical benefits beyond what is required for short-term stabilization. *Diaz,* 628 S.E.2d at 4–5.

of an emergency medical condition," the patient was not experiencing an emergency medical condition at the time he received the chemotherapy treatments. *Id.* at 5.

Having reviewed these interpretations of Section 1369b(v) and the term "emergency medical condition," we now turn to the arguments presently before this Court.

Spring Creek argues that the Department erred in finding that W.T. does not have an emergency medical condition because, if she does not receive the care Spring Creek provides, "her health would be in serious jeopardy, she would suffer serious impairment to bodily functions, and she would suffer serious dysfunction of a bodily organ or part." (Spring Creek's Br. at 11.) Spring Creek asserts, based on *Scottsdale*,[8] Section 322.32 of the Department's Medical Assistance Eligibility Handbook (Handbook) and the Operations Memo, which states that whether "there is a need for emergency medical services involving ongoing treatment (such as dialysis) . . . must be determined on a case-by-case basis," (Operations Memo at 1, R.R. at 42a),[9] that:

> [a]n ["]emergency medical condition["] does not necessarily end when a person's initial condition has been stabilized. An "emergency medical condition" does not require that acute symptoms continue, but only that the medical condition had initially manifested itself by an acute symptom and that the patient's condition was such that the absence of immediate medical treatment for the initial condition could result in one of the three adverse consequences listed in the statute.

(Spring Creek's Br. at 10.) Thus, Spring Creek claims that, given the evidence that W.T. cannot care for herself and that she would be in danger of "another stroke, fractures, choking, acquiring aspiration pneumonia, pressure sores, bone infections, urinary tract infections and potential death," she "is clearly receiving ongoing treatment for her stroke." (Spring Creek's Br. at 12.)

8. Spring Creek also relies on *Mercy Healthcare Arizona, Inc. v. Arizona Health Care Cost Containment System*, 181 Ariz. 95, 887 P.2d 625, 628–29 (Ct.App.1994), in which the Court of Appeals of Arizona held that coverage for treatment for emergency medical conditions is not limited "to services for treatment while acute symptoms continue. Rather, the statute requires that the medical condition manifest itself by an acute symptom (including severe pain).'" Because it was undisputed that the patient's conditions manifested itself by acute symptoms, the Arizona Court of Appeals held that the patient remained eligible for benefits "until that point in time that his condition no longer required immediate medical attention to avoid placing his health in serious jeopardy, seriously impairing his bodily functions, or causing serious dysfunction of a bodily organ or part," which was a disputed fact that had not been resolved. *Id.* at 629. Accordingly, the Court of Appeals reversed the grant of summary judgment and remanded the matter to the trial court to apply the above-cited standard. *Id.* However, the Second Circuit rejected this rationale in *Greenery*, 150 F.3d at 231–33, and the Arizona Supreme Court in *Scottsdale* limited *Mercy's* holding, stating "[b]ecause of the procedural posture of the case, *Mercy* . . . did not fully develop a test to determine when a patient no longer is receiving emergency care but instead is receiving long-term care. *Greenery* did set forth such test." *Scottsdale*, 75 P.3d at 95. Therefore, we conclude that *Mercy* offers little assistance in making our determination.

9. The Operations Memo also provides that "[a]n evaluation of need for emergency services involving ongoing treatment will now be made at the county level by each CAO[']s Executive Director or designee. Conditions where there may be a need for ongoing treatment include, but are not limited to, dialysis, cancer treatment or high-risk pregnancies." (Operations Memo at 1, R.R. at 42a.)

■ The CAO responds, citing *Greenery, Scottsdale,* and *Diaz,* that the Department properly affirmed its denial of MA/LTC benefits because W.T.'s emergency medical condition, i.e., her stroke, had stabilized by the time she had been transferred to Spring Creek and she had no acute symptoms of an emergency medical condition while at Spring Creek.[10] The CAO argues that the facts in this case are similar to *Greenery* and asserts that this Court should affirm based on *Greenery's* rationale. Moreover, the CAO argues that Spring Creek failed to present evidence of the specific nature of W.T.'s emergency medical condition or evidence of what exact medical treatment was necessary because of an emergency medical condition. According to the CAO, the Department's determination is supported by the evidence from the hospital physicians treating W.T.'s stroke, indicating that her medical condition had stabilized prior to being moved to Spring Creek, the report of its own physician who reviewed the matter, and Clinical Officer's testimony that W.T.'s treatment and care was for chronic conditions. The CAO also points out that Clinical Director's testimony that W.T. was being treated for an emergency medical condition was not credited. Additionally, the CAO contends that neither the Operations Memo nor Section 322.32 of the Handbook change the requirement "that there be a continuing emergency medical condition at the time that the on-going medical treatment was provided to the individual." (CAO Br. at 21.) The CAO contends that Spring Creek's arguments on this point are akin to those rejected by the Supreme Court of North Carolina in *Diaz,* which required that the treatment be immediately necessary to prevent the three statutory outcomes, and asserts that, like *Diaz* and unlike *Szewczyk,* the record lacks competent, credible medical evidence to support Spring Creek's claim that W.T. is receiving ongoing treatment for an emergency medical condition.

■ After considering the arguments, the plain language of Section 150.11 of the Department's regulations and Section 1396b(v) of the SSA, and the existing case law interpreting Section 1396b(v), we, like the other courts that have addressed this issue, believe we must focus on the term "acute." The plain language of Section 1396b(v), which Section 150.11 mirrors, requires an emergency medical condition to manifest itself through *acute* symptoms, which is defined as "characterized by sharpness or severity . . . having a sudden onset, sharp rise, and *short course* . . . [*as*] *opposed to chronic,*'" *Greenery,* 150 F.3d at 233 (quoting Webster's Third New International Dictionary at 23) (emphasis added), and those symptoms must "be short-lived," *Scottsdale,* 75 P.3d at 97. Applying this standard, the Second Circuit, in *Greenery,* found that patients, who were receiving "chronic skill care," did not have

---

**10.** The CAO argues, in its brief, that we should hold that Spring Creek has waived all of its arguments because it stated three issues in its Statement of the Questions Involved, but did not separate its arguments into three sections in the Argument section of the brief. *See* Pa. R.A.P. 2119 (stating that "[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part . . . ."). Although it appears that Spring Creek's brief is technically defective, such defect does not preclude this Court from discerning Spring Creek's arguments on appeal or from performing meaningful review of the issues on appeal; therefore, we decline to hold that those issues were waived for failure to brief. *See Eltoron, Inc. v. Zoning Hearing Board of City of Aliquippa,* 729 A.2d 149, 153 (Pa. Cmwlth.1999) (declining to find waiver based upon, *inter alia,* Pa. R.A.P. 2119 where compliance, although technically defective, did not preclude meaningful review of the issue on appeal).

an emergency medical condition that corresponded in time with that care and, therefore, the patients were ineligible for benefits. *Greenery*, 150 F.3d at 232. Similarly, in applying this standard, the Arizona Supreme Court, in *Scottsdale*, held that "a medical condition manifesting itself by *chronic symptoms is not an emergency medical condition, even though the absence of medical care might lead to one of the three adverse consequences listed [in] the statute.*" *Scottsdale*, 75 P.3d at 97 (emphasis added). Thus, to meet the standard the emergency medical condition must manifest itself through acute symptoms, and the treatment for the emergency medical condition must be immediately necessary to prevent the three statutory outcomes. *Diaz*, 628 S.E.2d at 2.

■ Here, Clinical Director testified that W.T. suffers from an "aggregate of very severe *chronic* conditions" and acknowledged that W.T.'s treatment and care would be for an indefinite period of time. (ALJ Hr'g Tr. at 26, 29, R.R. at 122a, 125a (emphasis added).) Moreover, as noted by the CAO, the ALJ did not credit Clinical Director's opinion that W.T. is receiving treatment for her stroke, (FOF ¶ 11), and a review of the record reveals that there is no evidence to support the conclusion that W.T. is manifesting *acute* symptoms thereby rendering her condition an emergency medical condition for which she would be eligible for MA/LTC benefits. *Greenery*, 150 F.3d at 232; *Scottsdale*, 75 P.3d at 97. The fact that, without the treatment she receives from Spring Creek, W.T. "might [suffer] one of the three adverse consequences listed [in] the statute," *Scottsdale*, 75 P.3d at 97, does not alter the fact that W.T. *currently* is not suffering from an emergency medical condition that, without *immediate* attention, would lead to one of the adverse consequences set forth in Section 150.11

and Section 1396b(v). *See Scottsdale*, 75 P.3d at 97 (holding that "the focus must be on the patient's *current* condition and whether that condition satisfies the criteria" of emergency medical condition) (emphasis added).

The lack of evidence in the record of the *immediate* need for W.T.'s current treatment distinguishes this matter from *Szewczyk*, in which a physician credibly testified that the disease being treated, for which there were acute symptoms, was "a rapidly fatal disease unless treated aggressively with chemotherapy" which had to be administered in a hospital because of the complications associated therewith. *Szewczyk*, 881 A.2d at 262 (emphasis omitted). Here, Clinical Director's testimony and the other record evidence indicating that W.T. may, eventually, suffer another stroke or other medical problems is more akin to the testimony of the physician in *Diaz*, who opined that, although the undocumented alien may regress "into a state of an emergency medical condition," he was not experiencing such a condition at the time of the treatment. *Diaz*, 628 S.E.2d at 5. As the Supreme Court of Connecticut noted in *Szewczyk*, the coverage sought by the undocumented alien was for a *"finite* course of treatment of the very condition that sent him to the emergency room, and *not for long term or open-ended nursing care.*" *Szewczyk*, 881 A.2d at 272 (citation omitted) (emphasis added). In contrast, Spring Creek is seeking coverage for an indefinite course of treatment for admittedly chronic conditions that are the *result* of the condition that sent W.T. to the emergency room; treatment that, in essence, is in the nature of "long term or open-ended nursing care." *Id.*

Finally, the provisions for ongoing care set forth in the Operations Memo do not mandate that W.T. be found eligible for MA/LTC benefits for ongoing treatment

for the results of W.T.'s stroke. The Operations Memo refers to eligibility requirements "if there is a need for *emergency medical services* involving ongoing treatment." (Operations Memo at 1, R.R. at 42a (emphasis added).) Before making this case-by-case determination, the following information must be advanced to a CAO: "the nature of the *emergency medical condition*"; "[t]hat the medical treatment was *necessary because of the emergency condition*"; and "[t]he approximate *duration of the emergency* (this includes a treatment plan)." (Operations Memo at 1, R.R. at 42a (emphasis added).) All of these requirements are predicated on the existence of an emergency medical condition for which ongoing treatment is necessary. Here, as stated above, Spring Creek failed to establish that W.T. currently is suffering from an emergency medical condition and, therefore, the ongoing treatment provisions explained in the Operations Memo are not applicable to W.T.

For the foregoing reasons, we conclude that the ALJ did not err or abuse his discretion in holding that W.T. is not receiving care and treatment for an emergency medical condition from Spring Creek and, therefore, W.T. is not eligible for MA/LTC benefits under Section 150.11 of the Department's regulations. Accordingly, we affirm the Order of the Department.

### *ORDER*

**NOW,** June 8, 2012, the Order of the Department of Public Welfare in the above-captioned matter is hereby **AFFIRMED.**